T. J. GREGORY, et al. v. MRS. KATE BEASLEY, Admr., et al.

Middle Section. February 11, 1928.

Petition for Certiorari denied by Supreme Court, May 26, 1928.

468

S. L. Felts, of Nashville, and L. A. Ligon, of Carthage, for appellants.

H. B. McGinness and W. V. Lee, of Carthage, for appellees.

DeWITT, J. The question presented is whether or not Tom M. Beasley (now deceased) was liable, as a co-surety, for contribution to complainants Gregory and Garrett. The bill was filed by them against W. H. Denney and the administratrix of Beasley. The Chancellor dismissed the bill. The complainants only insist, upon appeal that he should have held that Beasley was liable.

The obligation upon which it is contended that Beasley should be treated as a surety was a promissory note for $10,000, dated June 18, 1920, payable to the order of W. R. Denney, and finally paid by complainants. This note was given for money borrowed of Denney. It was signed by Alex Allen and endorsed by S. E. Ross, E. P. Garrett, J. M. Freed, W. T. Bennett, Jim Alexander, T. J. Gregory and H. B. Wright. It was not signed by Beasley.

These gentlemen, with Beasley and others, were stockholders in a corporation styled Haines Oil and Gas Company, operating near

Scottsville, Kentucky. This corporation had become insolvent and was almost out of business. Alex Allen was its president. Mr. Denney was first requested to lend the money to the corporation, with personal sureties, but he refused to accept a note containing the name of the corporation and agreed to lend the money to those gentlemen whose names were signed to the note as aforesaid. He gave to Allen his check for $10,000. Allen deposited it to his own credit in the Peoples Bank of Dixon Springs, then by his check transferred this fund to the credit of the Haines Oil and Gas Company in the same bank. The corporation had already to its credit in the bank about $5000 derived from the sale of its equipment. Its treasurer thereupon paid the $15,000 to the Fourth and First National Bank of Nashville in discharge of a note of the corporation for that amount. The money borrowed from Denney by the parties named was borrowed for the purpose of satisfying pro tanto this obligation held by the Nashville bank. Beasley and eleven others, including the complainants, were sureties upon this note for $15,000. It was dated April 26, 1920 and fell due sixty days thereafter. The Fourth and First National Bank demanded payment and the money was thus obtained and payment was made.

Sometime between January 1, 1920 and April 30, 1920, Beasley sold his stock in the corporation. At the time of this sale he was a surety on the note for $15,000 held by the Nashville bank. He gave as the reason for selling his stock that there were some more notes to be signed and he thought that if he should dispose of his stock he would not be asked to sign them. He refused to take part in procuring the loan from Denney or to sign the note to him.

The Haines Oil and Gas Company was organized in 1919 for the purpose of drilling for oil and gas in the Scottsville field. Mr. Beasley was one of the incorporators. In July, 1919 the corporation borrowed $20,000 from the Fourth and First National Bank, upon its note, with Mr. Beasley and eleven other stockholders, including the complainants, as sureties. This loan was first suggested by Beasley, and the object was to purchase an oil well. The note was executed by the parties at the same meeting at which the loan was authorized. The money was used for purchase of the well and in carrying on operations. The obligation was carried by renewals or extensions until January 26, 1920, when $5000 was paid on it from sales of stock and from small production from operations. A renewal note for $15,000, due in ninety days, was executed, with the same sureties, except two who are not herein involved. When this renewal note matured, April 26, 1920, the production had almost ceased, oil had fallen to fifty-seven cents per barrel, and the income was insufficient to pay the pumper. The corporation had no money. The bank accepted another renewal note, due in sixty days, with the same sure-

ties, but at the maturity of this note .it demanded payment. The money was obtained and payment was made as heretofore set forth.

The theory of the complainants is that they individually paid the sum of $10,000 on the note on which T. M. Beasley was surety, and that they are therefore entitled to contribution from his estate. On the other hand, the administratrix insists that the complainants simply loaned or advanced the sum of $10,000 to the corporation, and that the debt to the bank was paid wholly by the corporation itself. The Chancellor sustained this latter proposition.

The complainants insist that in June, 1920, payment of the note being demanded, they and the others signing the Denney note regarded the Haines Oil and Gas Company as hopelessly insolvent, without ability, present or prospective, to pay the sum of $10,000 needed to discharge the note; that the sureties well understood and realized they would themselves have to raise that sum; that it was borrowed from Denney without hope that the corporation would ever be able to meet its obligations; that it was borrowed to pay this note and for no other purpose, because they were already bound as sureties and the note had to be paid.

The defendant insists that this theory and contention of the complainants is an afterthought; that the parties at the time contemplated floating a loan for the corporation to procure funds to discharge its note for $15,000; that while the corporation was not prospering, its liabilities exceeding its tangible assets, and while the parties doubtless had at the time grave apprehensions lest they should ultimately be required to pay out money on account of their endorsements for it, yet that the corporation was still functioning and continued to do so for a year and a half afterward, that at the time it was the owner of certain oil leases in Allen county, Kentucky; that it purchased a new lease at the price of $3000 just about the time the note of June, 1920 was executed to Denney, the complainant T. J. Gregory being active in the negotiations in connection with the purchase of this lease, and furnishing to the corporation a portion of the money to pay for said lease.; that it was still pumping oil from its wells, and continued to do so for a year and a half thereafter; that the nature of the business in which the corporation was engaged was such that it might be insolvent today and rich tomorrow; and that all the facts and circumstances surrounding the W. R. Denney loan go to show that the indebtedness arising from this loan was by the parties still regarded as a company liability, and that complainants and the other parties did not at the time they signed the W. R. Denney note for the purpose of procuring money to pay on the Nashville note regard themselves as thus individually paying to that extent the Nashville note.

The determinative question is, did the complainants actually discharge an obligation on which T. M. Beasley was jointly liable with them?

It appears that Allen, one of, the sureties and the president of the company, took the initiative in procuring the money with which to discharge the debt to the bank; that the loan was originally requested of Denney for the company; that it was made to the individuals who signed the note because Denney would not lend on a note on which the signature of the corporation appeared; and that the sole purpose of the loan was to pay the debt to the bank. Of course, the sureties, including Beasley, were also primarily liable to the bank. Mr. Allen testified that he borrowed the money to let the corporation use it in paying the debt to the bank. The signers of the Denney note understood that this was the purpose; that although they signed the note "for the company," they were already liable as sureties and the Denney loan was being made to them as individuals.

The corporation was insolvent on June 18, 1920. It had been compelled to sell much of its machinery to raise the sum of $5000. It was a speculative enterprise typical of that period. For six months it had been unable to pay anything on its debt to the bank. Beasley had sold his stock at sixty cents on the dollar and four or five weeks later this stock was resold at seventeen and one-half cents. But it also appears that these parties were clinging to the hope that by continuing to operate, the corporation might strike oil abundantly and make enough money to pay its debts. They did not regard the conditions hopeless although it seems that Mr. Allen, the president bought this Beasley stock at seventeen and one-half cents and complainant Gregory and two other stockholders loaned the corporation $500 a piece with which to purchase an additional lease in the summer of 1920, with the hope that some money could be made by drilling on the land. They knew that the oil supply was failing and the price was low and that they were going to suffer from having to pay on the note to the bank. Mr. Gregory testified that when he loaned this $500 for this purpose he did not have hope that the company would pay all its debts, but he hoped that it might pay some; that he just loaned the $500 and at the time he promised it he did not know that the company was in as bad a shape as it was in; but that after he promised it, he just let it go and never got it back. The purchase of this lease was authorized by the directors. As showing the state of mind of certain of these parties at the time the money was borrowed from Denney, several of them in testifying used expressions implying clearly that they were "listening to the whisper of fancy or pursuing with eagerness the phantoms of hope." Mr. Wright said that they "hoped that it would pay out;" that at that

time there were a number of producing wells on the land leased by the corporation, and it had sold considerable oil. He also said that he understood that they were securing an indebtedness for the corporation. He based his hope finally upon the fact that one-eight-acre lease was still producing some, and that the other lease newly purchased might pay something. Mr. Alexander testified that they had good reasons to think that they might make money out of it; and that they borrowed the money for the company. He did not adduce any facts as a basis for his belief. Mr. Allen reflected the characteristic state of mind in testifying that he thought it was a good investment if he could hold on to it until they struck oil; so also did Mr. Ross in testifying, "they were holding on, grabbing at straws, hoping to strike oil or sell their lease."

The appellants by suits enforced contribution from three of the signers of the Denney note, Messrs. Wright, Alexander and Freed; and Mr. Ross, another signer, arranged with them to bear his part of the burden when the amount of it should be fixed. These sums so collected and the share of Ross were insufficient to reduce the burden that has fallen upon the appellants to what it would be if all the solvent sureties had borne an equal share of the burden. It is clear that it would require payment of the contributive share of Beasley to make the loss under the suretyship fall equally on all the solvent sureties, they being the appellants Gregory and Garrett and Messrs. Ross and Beasley.

Mr. Beasley died on May 28, 1923. In August, 1922 these appellants and Messrs. Wright, Ross and Alexander, brought suit against their co-surety J. M. Freed for contribution on the Denney note, and they did not sue Mr. Beasley. On June 28, 1923 these appellants and S. E. Ross brought suit against Messrs. Wright and Alexander for contribution. The personal representative of Beasley was not made a party defendant to this suit. The failure of the appellants to sue Beasley or his representative, as well as the aforesaid facts of the corporation continuing to drill for oil and purchasing another lease, under the hope of its stockholders that it might pay something on its debts, are relied on in support of the Chancellor's finding that this note made to Denney was really a continuation of that much of the debt of the corporation to the bank, that the loan was made in effect to the corporation and the payment to the bank was made by the corporation and not by the sureties. These facts are relied upon as supporting the theory that it was understood that Beasley was released from his suretyship, and that the contention of the appellants made in this suit was an afterthought.

No express agreement to release Beasley is shown. The fact that Allen, to whom Denney gave his check, first deposited it to his own credit and then transferred it to the credit of the corporation by

his check, would not of itself constitute this merely a loan to the corporation by Denney or by the obligors on his note. Equity looks through the form, or superficial aspect, to the real substance. In Hall v. Gleason, 158 Ky., 789, 166 S. W., 608 the defendant and the other directors of a hotel company executed a note to one Graves for money borrowed for the company, and the corporation, becoming insolvent, defaulted in payment. Judgment was obtained upon the note against all the directors except defendant Gleason. The other directors, instead of paying the money to Graves deposited it in a bank to the credit of the corporation and immediately it gave its check to Graves in satisfaction of the judgment. It was argued, upon these facts, that the individuals had not paid Graves anything; that they simply loaned the money to the hotel company and it satisfied the judgment. The Court of Appeals of Kentucky, responding to this argument, said:

"We do not think there is much merit or substance in this defense. Under the facts stated, the mere form of the transaction is not to be regarded as controlling. It would, of course, have been simpler if these appellants had paid Graves directly the money, but the mere circumstance that they paid it to the hotel company, and the hotel company turned it over to Graves, does not, under the facts admitted by the pleadings, change the nature of the transaction. The money was in truth and in fact paid by Graves by them in discharge of the judgment, and the mere circumstance that it happened to be paid through the medium of the hotel company does not in any manner prejudice the rights of the appellants or operate to release Gleason from liability. The parties were merely sureties for the hotel company and handed their principal the money to give to Graves in place of paying it directly to him themselves."

It is shown in the testimony that Beasley refused to sign the note to Denney; that he did say that he was ready to pay off his part of the obligation to the bank, but was not going to sign any more notes; and that because one or more of the other sureties did not have the money to pay their proportions of the debt, he did not pay his part. Mr. Alexander, who testified particularly concerning this, was asked why he did not tell Beasley that he and his co-sureties were raising the money by the loan from Denney and accept his part to help reduce the amount they were having to raise. He answered that the proposition looked good enough to him at the time and he had no objection to Beasley getting off the note. He explained this statement by further saying that the other men signing the note with him made the proposition look good to him.

If the appellants and their co-sureties, after borrowing the money, merely loaned it to the corporation, although it was loaned for the

purpose of enabling the corporation to pay the debt, it was a payment by the corporation and the sureties on its note were discharged. If the corporation borrowed the money and paid this debt, it was a novation. If the appellants and their co-sureties borrowed the money solely because they were already obligated on the note that had fallen due and payment thereof was demanded, and they simply wanted to discharge their obligation as sureties, then although Beasley had sold his stock and declined to sign any more notes, he would not be released from his obligation as a solvent surety to contribute to the payment of the debt for $10,000, and interest.

It is evident that these appellants and their co-sureties, finding that the corporation could not borrow the money, borrowed it as individuals and discharged their obligation as sureties on the note to the bank; and it is also evident that at least some of them hoped that by continuing in operation the corporation might earn money to repay them at least in part. However, they had little confidence in any prospect of success. Mr. Wright testified that he was not willing to lend any money to the corporation or to buy any more stock in it, because it was "a money losing game." He said that they borrowed this money to satisfy their liability on the note to the bank, and this was the understanding of all of them. Mr. Gregory testified that they all knew that the money would have to be paid and they began to look about for money with which to pay the obligation; that they had to borrow the money as they did not have it; and that Allen in obtaining the loan was acting for the individuals who were sureties. To the same effect was the testimony of appellant Garrett. He said that by June 20th they had all realized that the debt to the bank was a debt of their own, that they would have it to pay because they were sureties.

In Brooke v. Boyd, 80 Wash., 213, 141 Pac., 357, Ann. Cas., 1916B, 359, the trustees of a corporation became sureties upon its note for borrowed money. It became insolvent. On maturity of the note one of the trustees refused to sign a renewal note. The other trustees twice executed renewal notes to the creditor. Suit was brought for contribution by these trustees against the one refusing to sign the renewals. The defendant insisted that he was in effect released from the obligation by the execution of the renewal notes. The court said:

"It may be that the bank by accepting the renewal note without the appellant's signature and surrendering the one upon which the appellant was bound, waived its right thereafter to proceed against the appellant for the indebtedness represented by the note, but it would be a novel doctrine to hold that this act released the appellant from contributing to his co-obligors who finally paid the indebtedness. He could be released from this obligation only by their consent, and the record is clear that they did not so consent. What-

ever effect may be given to the action of the bank with reference to its rights, if the effect of the execution of the renewal notes was to extinguish the note upon which the appellant was bound, the renewal was a payment of the note as to him by his co-makers, and his liability to contribute arose at once. On the other hand, if such renewal was not a release of his obligation to the bank, he was finally released when the last of the renewal notes was actually paid and his obligation to contribute to his co-makers arose at that time.''

If the note to Denney had been signed by the corporation as principal, with these parties as sureties who did sign the note, Beasley would certainly have been released from his obligation upon the note held by the bank, for such transaction would have been a novation. But if co-sureties pay off and extinguish the original obligation, even by their individual note to the same creditor, they would be entitled a contribution from a nonpaying surety. Bell v. Boyd, 76 Tex., 133; Northwestern National Bank v. Great Falls Opera House Co. (Mont.), 57 Pac., 440.

In Adams v. DeFrehen, 27 Pa. Sup. Ct., 184, the suit was brought for contribution among co-sureties. The sureties, directors and stockholders of a corporation, endorsed the corporation's note to enable it to borrow money. The note was renewed from time to time. When the last renewal matured the defendant, sued for contribution, had ceased to be an officer and stockholder and refused to join in another renewal of the note, thereupon the other sureties had the corporation make a new note to them which they endorsed and discounted at the same bank which held the past due note endorsed by all the sureties for this corporation and with the proceeds of this new note paid off the former note. The defendant insisted that this was either a payment of its note by the principal, or a renewal of the note which operated to extend the time of payment and release him. Both of these contentions were denied in the lower court and a verdict was directed in favor of the plaintiffs. Upon appeal this action was reversed upon the ground that the jury should have been allowed to determine whether the note had been paid by the corporation or by the plaintiffs. In declaring the law governing the case the court said:

''If the new note was given in renewal of the old one, then the payment was by the corporation, or if at the time the new note was given the plaintiffs agreed to give to the corporation time upon the old note then the defendant cannot be called upon to make contribution. Hartley v. Kirlin, 45 Pa., 49; Barnett v. Reed, 51 Pa., 190. If the liability of the corporation upon the note which had been protested, remained unchanged by the subsequent dealings, and the new note was simply taken by the plaintiffs as a security collateral to the original obligation, the

defendant as a co-surety was deprived of no right, and upon payment of the original obligation by his co-sureties, he could be called upon to make contribution, although he would be entitled to credit for his pro rata share of any amount realized upon the new security. Slaymaker v. Gundacker, 10 S. and R., 75; Hacker v. Perkins, 5 Warton, 95.''

In Slaymaker v. Gundacker, 10 Sergeant and Rawle (Pa.), 74, it appeared that Slaymaker, Gundacker and others, directors and stockholders of the corporation, raised money for the corporation on the individual note of Slaymaker, endorsed by Gundacker and others. This note was renewed from time to time by all of the parties. On the maturity of the last renewal Slaymaker and two other parties executed a new note in which Gundacker did not join. The corporation became insolvent and Slaymaker brought suit against Gundacker's executors for contribution. The trial judge held that the making of the latter note by Slaymaker and others was not prima facie evidence of payment of the former note by them, and directed a verdict for defendant. This holding was reversed by the Supreme Court, which declared that the making of such new note was prima-facie evidence of payment of the prior note by Slaymaker and the others, and that the question whether or not it was made with that intention should have been left with the jury to determine. The court said that in considering the questions involved it was always to be kept in view that the money was borrowed for the use of the corporation, and applied to the payment of its debts; that the maker and endorsers of the note were, with respect to each other, in the nature of sureties for the company; and as such there could be no doubt that in the absence of all special agreement, there existed between them a mutual responsibility in case of loss; and that the principle of contribution arose from the nature of their situation.

It appears from the evidence that the note to Denney, signed by Allen, was left in the bank at Dixon Springs to be signed by all those who were sureties to the note to the Fourth and First National Bank, just as the renewal notes had been left for their signatures; and that it was not known to the complainants until after Beasley had declined to sign and the note had been sent to Denney without his signature, that Beasley was not going to sign this note.

We are of the opinion that the borrowing of the money from Denney solely upon individual signatures and for the purpose of discharging the obligation to the bank; using the money to this end without taking any note from the corporation payable to the parties furnishing the money—all this is prima-facie evidence of payment, pro tanto, on the note to the Nashville bank by these individuals. Novation is never presumed and must be clearly established by evidence of the discharge of the original debt by express agreement or

by the acts of the parties clearly showing the intention to work a novation. Sharp v. Fly, 9 Bax., 4; Henry v. Nubert (Chy. App.), 35 S. W., 444; Braly v. Ragsdale, 3 Tenn. App. Rep., 205; 29 Cyc., 1130. The burden was therefore upon the defendant administratrix to establish her contentions. We do not think that she has carried this burden. It is virtually undisputed that the money was borrowed for payment on the note, not for payment of the cost of operation. It is evident that the money was borrowed because of the existing liability of these parties as sureties; that they would not have incurred this large obligation had they not been already bound. It is hard to conceive that any men of reasonable skill and prudence would have borrowed this money, under the circumstances, for purposes so hazardous, giving such slight, if any, prospect of success. The corporation had other stockholders. These sureties obtained from it no evidence of obligation to them, nor does it appear that any was requested. It is evident that they were unwilling to lend any money to it or buy any more of its capital stock. These circumstances all point to the conclusion that these complainants and their co-sureties paid the money as individuals; that their note to Denney was not a continuation of the note of the corporation to the bank. The mere fact of failure to sue Beasley when other sureties were sued, while not fully explained, does not show a waiver of the right nor a previous assent to a release. The subsequent limited operation by the company, the venture upon another lease, with small sums contributed by a few stockholders, cannot be taken as proof that the money was borrowed to enable the corporation to engage in such operation. It was predetermined that the money would be used to discharge the note; and the small operation afterwards engaged in was made possible by the loan or contribution of other funds by a few stockholders. We are unable to infer, from the course of conduct of these parties, an agreement to release Beasley from his obligation to contribute as a surety upon the original note. All of these parties, including Beasley, stood in aequali jure as to the original obligation. Equity, which delights in equality, requires that the discharge from that common obligation which inured to the equal benefit of all, shall be obtained at their equal expense.

The decree of the Chancellor is therefore reversed and the cause will be remanded to the chancery court of Smith county for an accounting and settlement of the obligations of the parties, the personal representative of Tom M. Beasley to be treated as one of the parties liable for contribution to the complainants. The costs of the appeal will be adjudged against the defendant administratrix. The costs in the chancery court will abide the final decree of the Chancellor.

Faw, P. J., and Crownover, J., concur.