SHARON ANNE HAYES, b/n/f. etc., Appellant, v.
HARTFORD ACCIDENT & INDEMNITY
COMPANY, Appellee.

MRS. ANNE S. HAYES, Appellant, v. HARTFORD
ACCIDENT & INDEMNITY COMPANY, Appellee.

MARK STEVEN HAYES, b/n/f. etc., Appellant, v.
HARTFORD ACCIDENT & INDEMNITY COMPANY,
Appellee.—417 S.W.(2d) 804.

Middle Section. March 31, 1967.

Certiorari Denied by Supreme Court August 7, 1967.

McAllen Foutch, Smithville, and Bryson & Bryson, Woodbury, for appellants.

Stephenson, Lackey & Holman, Nashville, for appellee.

PURYEAR, J. On March 9, 1962, the appellant, Sharon Anne Hayes, by next friend, Mark David Hayes, recovered a judgment for $15,000.00 damages against William Rutland in the Circuit Court of DeKalb County,

Tennessee. On the same date the appellants, Mrs. Anne S. Hayes and Mark Steven Hayes, recovered judgments against Rutland in the same Court for damages in the sum of $2,000.00 and $1,000.00 respectively.

The Circuit Court suits in which such judgments for damages were rendered originated out of an automobile accident involving a truck driven by Rutland on the 25th day December, 1960. This vehicle, which was a 1948 model Chevrolet, three-quarters ton truck, was purchased by Rutland from one Paul Curtis, a used car dealer in Alexandria, Tennessee, on or about November 14, 1960. As consideration for this Chevrolet truck, Rutland traded to Curtis a 1950 model Ford pick-up truck and paid Curtis $75.00 in cash.

On the day that this trade was made, Rutland left his 1950 model Ford truck on the Curtis lot, took the license plates off of it and placed them on the 1948 model Chevrolet truck, all with the consent and knowledge of Curtis.

There is a sharp conflict of evidence as to when Curtis transferred title certificate to the Chevrolet truck to Rutland and this conflict will be discussed later in this opinion.

After recovering the aforesaid judgments in Circuit Court against Rutland, the appellants each filed a bill in the Chancery Court of Davidson County, against the appellee alleging the recovery of such judgments and further alleging that at the time of the accident in question the appellee herein, Hartford Accident & Indemnity Company, was the insurer under a certain garage liability policy issued to Curtis, which policy contained the following provision, to-wit:

"III. Definition of Insured—

(2) Any person while using an automobile covered by this policy, and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission."

In these bills the appellants further allege that at the time of the accident in question, which resulted in the foregoing judgments in their favor, Rutland was operating the Chevrolet truck as an additional insured under the above quoted provision of the garage liability policy issued by Hartford.

The bill further alleges that such judgments were unpaid and prayed for recovery against Hartford for the amount of such judgments, together with interest and statutory penalty, and for general relief.

To all three of these bills, Hartford filed an answer admitting that it did issue to Paul Curtis a garage liability policy, which was in force at the time of the sale in question, but expressly denied that the Chevrolet truck was the property of Curtis at the time of the accident, and further expressly denying that Rutland was an additional insured under the terms and provisions of such policy.

The cases were tried before the Chancellor upon depositions, documentary evidence and stipulations, as a result of which trial the Chancellor concluded that Rutland was the owner of the Chevrolet truck in question at the time of the accident and that Rutland was not an additional insured under the terms and provisions of the garage liability policy.

On July 20, 1966, the Chancellor entered a decree dismissing all three of the bills, from which action of the Court dismissing such bills, the appellants have prayed and perfected their appeals to this Court and have filed a single assignment of error which is as follows:

"The trial court erred to the prejudice of the appellants (complainants) in holding and adjudging that William Rutland was not an additional insured under its garage liability policy issued to Paul Curtis, in dismissing their consolidated suits, with costs, and in failing to decree the relief sought therein."

In their well reasoned briefs, counsel for appellants state in substance that the real issue before the Court in these cases is whether or not the seller, Curtis, or the purchaser, Rutland, owned the Chevrolet truck in question at the time of the accident.

Counsel for the appellants insist that title to the Chevrolet truck in question did not pass to Rutland until after the accident, because it was after the accident that Curtis indorsed or assigned the certificate of title to such truck to Rutland.

The sharpest conflict in the evidence is on the question of when the certificate of title was actually assigned by Curtis to Rutland.

On this question, Rutland testified that at the time delivery was made in November, 1960, Curtis promised to assign and deliver to him the certificate of title, but never did it until some time in January, 1961, after the accident had occurred.

Rutland testified in substance that, before the accident he made several attempts to get the certificate of title

from Curtis, but, for some reason unknown to him, Curtis did not deliver it to him and that finally in January, 1961, after he got out of the hospital, he went to see Curtis and took with him a friend of his, Mr. Gordon Walker, a Justice of the Peace. He further testified that it was at this time, in the presence of Walker, that Curtis assigned and delivered the certificate of title to him and acknowledged the assignment before his wife Mrs. Evelyn Curtis, which assignment was dated November 14, 1960.

He further testified that when this date of November 14, 1960, was placed on the assignment, Walker told Mrs. Curtis it should not be dated back to November 14, 1960, but she paid no attention to him.

Walker testified that he was present at the time this certificate of title was assigned, that the date of such assignment was some time around the middle of January, 1961, and when he saw that it was being dated back, he told Curtis that should not be done, but this suggestion was not heeded by either Mr. or Mrs. Curtis.

Counsel for appellants insist that title to the 1948 Chevrolet truck involved in the accident remained in Curtis until he assigned and delivered the certificate of title thereto on some date in January, 1961, after the accident occurred.

Council specifically insist that the transfer was not accomplished because of failure of Curtis to comply with the following Code Sections:

"Section 59-319. *Transfer of Title.*— (a) In order to transfer title to any motor vehicle coming within the title provisions of chapters 1 through 6 of this title, the owner shall indorse an assignment and warranty of title upon the certificate of title, if in his possession,

for such vehicle with a statement of all liens or encumbrances thereon, which statement shall be verified under oath by the owner, and he shall deliver the certificate of title and title card to the purchaser or transferee at the time of delivering the vehicle, except as provided in sec. 59-330. (This exception applies to a vehicle to be dismantled.)

(b) Any owner desiring to transfer title to any motor vehicle coming within the title provisions of chapters 1 through 6 of this title, whose certificate of title is being held by a lienor, may, in lieu of executing the assignment provided on the reverse side of his certificate of title, execute and deliver to the transferee a separate bill of sale which shall show the name and address of the lienor in whose possession his certificate of title is being held and all such other information as may be required by the reasonable rules and regulations of the commissioner, and which bill of sale shall be signed by the seller, whose certificate shall be acknowledged before a notary public, together with his title card."

"59-321. *Transfers to dealers.*—When the transferee of a vehicle is a dealer who holds the same for resale and lawfully operates the same under dealer's registration plates, such transferee shall not be required to obtain a new registration of said vehicle or be required to obtain a new certificate of title, but such transferee, upon transferring his title or interest to another person, shall execute an assignment and warranty of title upon the certificate of title, if in his possession or if in the possession of lienor, or he shall execute a bill of sale and deliver the same to the person to whom such transfer is made, together with his evidence of owner-

ship, which assignment or bill of sale shall be acknowledged before a notary public."

In his memorandum opinion (tr. pp. 36, 37, 38 and 39) the learned Chancellor found as a fact that the certificate of title was not executed on November 14, 1960, but in January, 1961, as insisted by Rutland and Walker, and we agree with this conclusion of the Chancellor. The Chancellor further concluded as follows:

"However, the Court is of the opinion that the rights of the parties are not determined by the time at which the 'title papers' were executed nor by the time of their delivery but by the acts of the seller and the buyer and their intention. At common law and under the Uniform Sales of Goods Act, T.C.A. 47-101, etc., the payment of the purchase price by the buyer and the delivery to him of the article so purchased by the seller constitutes a completed transaction and vest the buyer with title to the property sold. He has complete control of it and the seller no longer has any interest therein. The sale of an automobile is governed by the Uniform Sale of Goods Act as is other property, except insofar as the law may have been modified by the provisions of T.C.A. 69-301, et seq., (sic) hereinabove set forth." (Tr. p. 38.)

\* \* \* \* \* \*

"The Court is of the opinion that Rutland became the owner of the 1948 truck when he paid his money and delivered his old truck as above set forth. He then proceeded to use the truck purchased in his own business. Curtis, the seller, had no claim on the truck, had no right to control the use of it and for all intents and purposes, except for the formal compliance with the

provisions of T.C.A. 59-301, etc. Rutland became the absolute owner thereof. He was using the truck in his own business and not that of Curtis and Curtis has no interest in the truck whatsoever, and the same was not being used with his permission.'' (Tr. p. 39.)

█ We are also of the opinion that the learned Chancellor correctly held that regardless of when the title certificate was assigned, Rutland became the owner of the Chevrolet truck in question on or about November 14, 1960.

The undisputed evidence shows that on or about November 14, 1960, Curtis and Rutland traded trucks, Rutland paid $75.00 in cash, delivered his 1950 Ford truck, removed the license plates (which were apparently issued in Rutland's name) from the Ford truck, placed such license plates on the Chevrolet truck, took possession and control of the Chevrolet truck at that time and thereafter used it as his own property.

There is no dispute between counsel for the parties about the garage liability policy in question containing the following provisions under the definition of hazards:

*"Definition of Hazards*

"Division 1—*Premises—Operations—Automobiles*:
The ownership, maintenance or use of the premises for the purpose of an automobile sales agency, repair shop, service station, storage garage or public parking place, and all operations necessary or incidental thereto; and the ownership, maintenance or use of any automobile in connection with the above defined operations, and the occasional use for other business purposes and the use for non-business purposes of (1) any automobile owned by or in charge of the named insured and used

principally in the above defined operations, and (2) any automobile owned by the named insured in connection with the above defined operations for the use of the named insured, a partner therein, an executive officer thereof, or a member of the household of any such person."

\* \* \* \* \* \*

"*III. Definition of Insured:* With respect to the insurance under coverage A, C and D the unqualified word 'insured' includes the named insured and also includes

\* \* \* \* \* \*

'(2) any person while using an automobile covered by this policy, and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission.' " (Tr. pp. 31-35 and 91.)

█ While many cases in other jurisdictions hold that failure to comply with motor vehicle title and registration laws renders the sale of a motor vehicle covered by such laws void, the weight of authority seems to be that the failure to comply with such title and registration laws does not render the sale void.

Many of the decisions in other jurisdictions adhering to the minority view are based upon provisions in the various statutes which provide or imply that failure to comply with such statutes renders such transfer void.

The split between decisions in the various states is pointed out in Vol. 7, Am. Jur., 2nd, Sections 42-43, pp. 628, 629, Automobiles and Highway Traffic in the following language:

"Noncompliance with those statutory requirements which relate specifically to the sale, transfer, or encumbrance of a motor vehicle ordinarily subjects one to a specified fine or penalty. Whether such noncompliance also affects the title to or security of, or the right to the possession or price of, the motor vehicle as between the parties to the transfer and their privies, or as against third persons, *depends upon the terms of the statutes and their construction.*" (Emphasis supplied.)

\*    \*    \*    \*    \*    \*

"In many jurisdictions the failure to comply with statutory requirements with respect to the sale or transfer of a motor vehicle has been held, *under the particular statutes,* not to render the sale or transfer void so as to affect title to or possession of the vehicle as between the parties thereto. Where the statute provides that the purchaser shall not acquire a marketable title to the motor vehicle until a certificate of title is issued to him this does not mean that the purchaser does not acquire any title to the vehicle and that he cannot sell it, but only that he cannot enforce an agreement to buy in the absence of the certificate of title." (Emphasis supplied.)

"In other jurisdictions the failure to comply with statutory requirements as to the sale or transfer of a motor vehicle has been held, *under the particular statutes,* to render the sale or transfer void with the consequence that it does not pass title to the vehicle. Under such statutes one who attempts to purchase a motor vehicle without complying with the statutory requirements as to transfer of title acquires no title whatever

and has no insurable interest in the vehicle." (Emphasis supplied.)

A careful examination of our motor vehicle title and registration law, which is Chapters 1 through 6, of Title 59, T.C.A., reveals there is no provision in such statute which renders a transfer void because of noncompliance with the provisions thereof respecting transfer and delivery of certificate of title.

■ We think that the primary purpose of enactment of all of the provisions of Chapter 3, Title 59, T.C.A., which is the Chapter specifically dealing with issuance and transfer of certificates of title, was to prevent trafficking in stolen cars and this viewpoint is supported by the following provisions in the statute itself:

"59-310. *Check of engine and serial number on application against indexes of registered and stolen and recovered vehicles.* — The division, upon receiving an application for a certificate of title, shall first check the engine and serial number shown in the application against the indexes of registered motor vehicles and against the index of stolen and recovered motor vehicles required to be maintained by chapters 1 through 6 of this title."

"59-312. *Refusal to issue certificate—Grounds.*—The division shall refuse to issue a certificate of title upon any of the following grounds:

1. The application contains any false or fraudulent statement or that the applicant has failed to furnish required information or reasonable additional information requested by the division or that the applicant is not entitled to the issuance of a certificate of title under chapters 1 through 6 of this title;

2. The division has reasonable ground to believe that the vehicle is a stolen or embezzled vehicle or that the issuance of a certificate of title would constitute a fraud against the rightful owner or other person having valid lien upon such vehicle;

3. The required fee has not been paid."

"59-328. *Misdemeanors enumerated—Failure to indorse or deliver certificate—Discharge lien—Report discharge of lien.*—(a) It is a misdemeanor for any person to fail or neglect to properly indorse or deliver any certificate of title or title card to the division, a transferee, or other person lawfully entitled thereto."

In our opinion, since the statute itself does not provide that transfer made in violation thereof is void, it cannot be fairly implied from the language thereof, for it does not appear to be the general purpose of the statute, that the Legislature intended to set aside the general principles applicable to sales of chattels.

The statute appears to be penal in nature and regulatory in character and the weight of authority in Tennessee appears to hold that the requirements thereof are directory and not mandatory.

Counsel for appellants have cited and quoted from the case of United States F. & G. Co. v. Allen, 158 Tenn. 504, 14 S.W.2d 724, but we do not consider this case in point. It involved a situation where the owner of a public conveyance, who had made a bond to the State of Tennessee for the benefit of the public, had transferred his public conveyance without compliance with the then existing title registration laws, and without notifying the State of changing the bond.

Relying upon our statute creating a presumption of ownership from registration, the Court held the seller and its bonding company liable for the negligent operation of the public conveyance by the purchaser. The true basis for this holding was the finding by the Court that under the circumstances the purchaser was the agent of the seller.

McCoy v. Willis, 177 Tenn. 36, 145 S.W.2d 1020, cited by counsel for appellants, was based upon a question of agency and also involved the presumption of ownership from registration.

The instant case is distinguishable from United States F. & G. Co. v. Allen and McCoy v. Willis, in many respects, including the fact that in the instant case the license plates which were owned by Rutland (and apparently issued in his name) were placed on the truck in question on the very day that it was delivered to him, and, although, the record is silent on this question, it is reasonable to assume that the Chevrolet truck bore these license plates at the time of the accident.

At the time of the transaction in question here, the Uniform Sales of Goods Act was in effect and it contained the following:

"47-1218. *Property in specific goods passes when parties so intend.*—(1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend is to be transferred.

(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade, and the circumstances of the case. (Acts 1919, ch. 118,

sec. 18; 1923, ch. 93, sec. 9; Shan.Supp. sec. 3670a29; Code 1932, sec. 7211.)''

"47-1219. *Rules for ascertaining intentions.*—Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer.

Rule 1. Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made and it is immaterial whether the time of payment, or the time of delivery, or both be postponed."

In 1963 the foregoing Code Sections were superseded by the provisions of the Uniform Commercial Code, which is codified under Title 47, T.C.A., and although this Uniform Commercial Code was not in effect at the time of the transaction in question here, we note that notwithstanding the provisions of T.C.A. 59-319 and 59-321, upon which appellants rely, and which are still in effect, Section 47-2-401 of the Uniform Commercial Code now provides as follows:

"(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest *and even though a document of title is to be delivered at a different time or place * * *.*''* (Emphasis supplied.)

Although as we have said, this latter Code section was not in effect at the time in question, we think it should be considered in determining legislative intent.

Counsel for appellants also cite and rely upon White v. Mid-City Motor Co., 39 Tenn.App. 429, 284 S.W.2d 689, wherein this Court held a sale without compliance with the motor vehicle title registration law was voidable. However, in that case the Court did not hold the sale was void because the seller failed to deliver certificate of title, but only held such a sale to be voidable at the election of the buyer because of implied breach of warranty in failing to deliver such certificate. Schaeffer v. Richard, 43 Tenn.App. 205, 306 S.W.2d 340, cited by counsel for appellants, holds to the same effect.

Although we do not specifically mention each and every case cited by learned counsel for appellants, we have considered all of the cases cited by counsel and do not think any of them are controlling to the extent we should be required to hold that Rutland, or the Chevrolet truck he was driving at the time of the accident, was insured under the terms and provisions of the garage liability policy.

■ There is an additional reason why the decree of the Chancellor should be affirmed. The cases before us on this appeal are suits in equity and, therefore, should be determined in accordance with the principles of equity, one of which principles is that such courts of equity act upon the circumstances and justice of the particular case, rather than regarding forms and the strict letter of the law.

Although, Courts of equity must follow the law, we think the foregoing principle applies to these suits. Gregory v. Beasley, 7 Tenn.App. 467; Brown v. Hamlett, 76 Tenn. 732; Lawman v. Barnett, 180 Tenn. 546, 177 S.W.2d 121, 153 A.L.R. 772; Commercial Standard Ins.

Co. v. Paul, 35 Tenn.App. 394, 245 S.W.2d 775; Birdsong v. Birdsong, 39 Tenn. 289; Martin Bank v. Woods et al., 24 Tenn.App. 241, 142 S.W.2d 750; Hasden v. McGinnis, 54 Tenn.App. 39, 387 S.W.2d 631.

In our opinion, it would be unjust and inequitable to hold the insurer of Curtis liable for damages inflicted by a motor vehicle which had been sold by the insured and had completely and irrevocably passed from his right of possession and control, simply because the insured had neglected to comply with a provision of the motor vehicle title and registration law by failing to execute and deliver a muniment of title prior to the occurrence of the accident, although the sale and transfer had been completed in every other respect.

The assignment of error is overruled and the decree of the Chancellor is affirmed.

Shriver and Humphreys, JJ., concur.