**BANK OF CROCKETT,**
**Plaintiff/Appellant and**
**Cross–Appellee,**

v.

**Darius CULLIPHER, Defendant and**
**Third–Party Plaintiff; Appellant**
**and Cross–Appellee,**

v.

**W.H. SPITZER, Third–Party**
**Defendant and Appellee.**

Court of Appeals of Tennessee,
Western Section, at Jackson.

Jan. 21, 1988.

Application for Permission to Appeal
Denied by Supreme Court
May 2, 1988.

R. Bradley Sigler, of Holmes, Rich & Sigler, Jackson, and Benjamin M. Huey, II and James Belew Webb of Flippin, Collings Huey & Webb, Milan, for Bank of Crockett.

Thomas E. Harwood, Trenton, for Darius Cullipher.

Pat H. Mann, Jr., Brownsville, for W.H. Spitzer.

TOMLIN, Presiding Judge, Western Section.

■ The Bank of Crockett County (hereafter "BANK") brought suit in the Chancery Court of Crockett County against Darius Cullipher (hereafter "Defendant") as co-maker of several promissory notes then in default and due to Bank. Defendant filed a counter-claim for damages against Bank and a third-party complaint for indemnity against a co-maker of one of the notes. Following a bench trial the chancellor dismissed Defendant's counter-claim and third-party claim. He awarded judgment for Bank against Defendant for the full amount of one note and for one-third of each of three additional notes. Both Bank and Defendant have appealed. The crux of the issue presented by Bank is whether Defendant is fully liable on all four notes payable to it. Defendant has set forth some sixteen issues on appeal in his brief. In capsulated form the majority of them may be stated as follows: Did Bank violate one or more sections of the Uniform Commercial Code so as to relieve Defendant from liability on the four promissory notes? Defendant also raises as an issue the action of the chancellor dismissing his third-party complaint. However, inasmuch as he fails to address that issue in his brief and argument, we treat it as having been waived. *Schoen v. J.C. Bradford & Co.,* 642 S.W.2d 420 (Tenn.App.1982); T.R.A.P. 27; Rule 6, Court of Appeals Rules. We hold that Defendant is liable to Bank for the full amount of all the notes less certain credits with the exception of the "master note" sued upon. We are also of the opinion that Bank committed no acts in this transaction so as to void any of the notes in question.

Many of the facts are uncontroverted. In April, 1982, Allen Roberts and Ricky Spitzer formed a partnership known as A & R Best Stop for the purpose of acquiring property near Bells, where they intended to build and operate a convenience store. They obtained a loan from Bank for that purpose. In accordance with standard banking practices of Bank, on April 26, 1982, a note designated "master note" in the amount of $75,000 was executed by Ricky Spitzer and his wife, Fran Spitzer, his father, W.H. Spitzer, Allen Roberts, and Roberts' mother-in-law, Mrs. Shelby Crossnoe. The note provided on its face that it was to be secured by a deed of trust on the convenience store, a deed of trust on the residences of Allen Roberts and that of Ricky Spitzer and wife, and a financial statement and security agreement on fixtures and inventory of the store.

A deed of trust in favor of Bank covering the convenience store property was also prepared but never recorded for the reason that just prior to closing the purchase of the property by Roberts and Spitzer, an error in the legal description of the subject property was discovered. This necessitated the obtaining of a corrected legal description and a revised warranty deed from the then owners to Roberts and Spitzer. All this was accomplished on May 10, 1982, along with the preparation of a new deed of trust containing the revised legal description from Roberts and Spitzer to a trustee to secure Bank. The Bank officer who handled this loan was of the opinion that a new master note was needed and caused such a note to be prepared. Said note was dated May 10, 1982, was also for the sum of $75,000 and carried the same terms and conditions as the first master note, except that it erroneously called for a "warranty deed" on the convenience store and omitted the inventory and fixtures of the store as collateral. This note was signed only by Ricky Spitzer and his wife and Allen Roberts (not by W.H. Spitzer or Mrs. Shelby Crossnoe). The deed of trust securing the second master note as well as the deed of correction was dated and recorded on May 10, 1982. It would appear from the record that the second master note became "lost" among the Bank's records until the trial in October, 1986.

Each master note contained the following provision:

Each Borrower, endorser, surety and guarantor hereof jointly and severally agrees to pay this Note and guarantees payment hereof and ... consents to any

extensions and renewals hereof without notice and consents to the release by the Lender hereof with or without consideration of any of them and exonerates the Lender hereof from all duty and obligation to make demand on anyone for payment of any Collateral now or hereafter securing this Note or to give notice to anyone of non payment thereof ... and consents to the extension, renewal, exchange, surrender or release by the Lender hereof with or without consideration of any such Collateral....

Between May 3, 1982 and July 2, 1982 draw notes against the $75,000 line of credit established by the master note were signed by either Roberts or Spitzer, after which Bank distributed funds to the partnership. The $75,000 credit limit was reached by a fifth and last draw note.

In the fall of 1982, Allen Roberts advised Bank of his intention to withdraw from the partnership with Spitzer and to go into business for himself in Brownsville. In that connection he asked to be relieved of any further legal obligation on the indebtedness of A & R Best Stop to Bank. It was also requested of Bank that Mrs. Shelby Crossnoe, Roberts' mother-in-law, be relieved from her obligation. It appears that in order to facilitate the sale of Roberts' house, the deed of trust Bank held on it in connection with this transaction was released in September, 1982. Roberts was advised that he and Mrs. Crossnoe would be released from the indebtedness if a satisfactory endorser was presented to Bank. Defendant had at that time been an oil jobber in Crockett County for many years. He was a person of good reputation and possessed a substantial net worth. As part of the convenience store operation, Defendant had installed several large underground fuel tanks, a concrete island, and several fuel pumps for the sale of Gulf petroleum products distributed by him. Roberts and Spitzer agreed to pay Defendant at the rate of one cent per gallon for each gallon of gasoline and diesel fuel sold at A & R Best Stop.

Defendant agreed to endorse the first master note with the full knowledge and understanding that Allen Roberts and Mrs. Shelby Crossnoe would be relieved from any further liability on that indebtedness. On February 26, 1983, Defendant signed the master note of April 26, 1982, and in his presence the bank officer handling the account drew lines through the names of Allen Roberts and Shelby Crossnoe, writing thereon "Allen and Shelby released on 2–26–83." On or about that date Roberts quit-claimed his interest in A & R Best Stop to his former partner, Ricky Spitzer, and the partnership was dissolved.

The original draw notes totaling $75,000 matured on April 29, 1983. On April 30, 1983, Ricky Spitzer, his wife, and Defendant went to Bank and executed four promissory notes, each due and payable on November 15, 1983. One note was in the face amount of $75,000, representing the renewal of the accumulated draw notes under the first master note. A second note was in the amount of $11,188.47, representing the amount of accumulated interest on the original draw notes. A third was in the amount of $2,500, and a fourth was in the amount of $4,500. The last two were renewals of prior notes given for funds borrowed in the name of A & R Best Stop over and above the original $75,000. In the space labeled "Security," the first three of the above-mentioned notes reflected that they were secured by a deed of trust on A & R Best Stop, a financing statement on inventory and fixtures and the endorsement of Shelby Crossnoe and W. H. Spitzer. The remaining note for $4,500 simply reflected that the security for the note was the business in the name of A & R Best Stop. All four notes provided for the payment of reasonable attorney fees in the event of default, as well as the following provision, among others:

**Obligations Independent**—I understand that my obligation to pay this note is independent of the obligation of any other person who has also agreed to pay it. You may release any of us, release any security, waive any right you might have against any of us, extend new credit to any of us, renew this note, or all of the above, without affecting my obligation to pay the loan amount.

In November, 1983 the Spitzers filed for bankruptcy. From time to time thereafter Bank sought to prevail upon Defendant to pay the four above-mentioned promissory notes then in default. He repeatedly declined to do so, notwithstanding the fact that Bank at one point sought to impose a penalty against him in the amount of one-tenth of one percent per day of the total due on the four notes. Bank foreclosed on the A & R Best Stop property in April, 1984, selling it to Defendant for $33,000. After deducting advertising and attorney fees in the amount of $915 and the one-tenth of one percent daily "service charge" in the amount of $5,785.44, Bank applied the sum of $26,299.56 against the principal indebtedness. When Defendant refused to make any payments on the balance remaining, this suit was brought.

## I. DEFENDANT'S COUNTER-CLAIM AND THIRD-PARTY CLAIM.

In regard to defendant's third-party complaint against W.H. Spitzer, we have already found and so hold that defendant waived this issue on appeal by failing to address it in his brief and argument. As to his counter-claim against Bank, it is raised as an issue only in the following manner: "Did the trial court err in not awarding Cullipher damages for Bank's outrageous conduct in the premises"? In reading Defendant's counter-complaint we note first of all that he does not allege in any fashion the tort of outrageous conduct against Bank. He does seek damages for what he characterized as acts of bad faith on the part of Bank. Having read the record in its entirety, we are of the opinion that the evidence does not preponderate against the action of the chancellor in dismissing the counter-complaint.

## II. LIABILITY OF DEFENDANT.

In seeking to avoid liability on either the master note or the renewal notes, Defendant's argument proceeds as follows: First, he contends that he is not liable on the first master note because the obtainment of the second master note by Bank constituted a novation of the first master note. He next contends that he is not liable on either the first master note or the renewal notes for the reason that he was an accommodation endorser and received no consideration for signing these notes. He also contends that he should not be held liable on three of the four renewal notes because Bank increased his exposure by impairing the collateral for said notes in not obtaining the endorsements of W.H. Spitzer and Shelby Crossnoe, and in releasing the mortgage on Allen Roberts' residence. Defendant further contends that Bank materially altered the notes and that Bank failed to complete the notes, thereby relieving him of liability under the U.C.C. Finally, Defendant seeks to be relieved of his obligation under the notes on the grounds of bad faith and breach of duty of reasonable care on the part of Bank in dealing with him.

### A. The Applicable Law.

Each note in question was signed by co-makers and contained an unconditional promise to pay a sum certain to order at a definite time. For these reasons Chapter 3 of the Uniform Commercial Code, codified at T.C.A. §§ 47–3–101, et seq., applies. *See also* T.C.A. § 47–3–104. The fact that the notes in question were secured by real property does not affect their status as negotiable instruments governed by Article 3. Section 47–3–105(1)(e) states as follows:

**When promise or order unconditional.** —(1) A promise or order otherwise unconditional is not made conditional by the fact that the instrument:

. . . .

(e) states that it is secured, whether by mortgage, reservation of title or otherwise. . . .

It will hereafter be observed that equally applicable to the case at bar are the general provisions of Chapter 1 of the U.C.C., codified at T.C.A. § 47–1–101, et seq., and more specifically § 47–1–102(3), which reads:

(3) The effect of provisions of chapters 1 through 9 of this title may be varied by agreement, except as otherwise provided in chapters 1 through 9 of this title and except that the obligations of good faith,

diligence, reasonableness and care prescribed by chapters 1 through 9 of this title may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

## B. Liability Under The First Master Note.

█ As heretofore noted, the master note served the purpose of creating a line of credit against which the borrowers might draw down funds. There was an original draw note in the principal amount of $75,000 dated July 2, 1982, which was renewed by a renewal draw note dated April 30, 1983, signed by Defendant and the Spitzers. As to the first master note, the chancellor had this to say:

> The Court further finds that the original master note in the original principal amount of $75,000.00 dated April 26, 1982, had been taken up and superceded [sic] by a second master note dated May 10, 1982, and which was signed by Ricky Spitzer and wife, Fran Spitzer, and Allen Roberts, and which was the active master note, and that there was no liability on the part of W.H. Spitzer for the payment of any part of said indebtedness, since he had not signed the second master note, nor any of the so-called renewal notes.

It does not appear that the chancellor made any finding of liability on the part of Defendant on the first master note. The language used by the chancellor clearly implies a finding of novation to the effect that the second master note acted as a novation of the first master note. To the extent that the chancellor so held and for whatever effect it might be on the outcome of this litigation, we are of the opinion that the second master note did not constitute a novation of the first one. The burden of proving novation by the execution of a second note falls upon the defendant. *Dies v. Wilson County Bank,* 129 Tenn. 89, 165 S.W. 248 (1914). Furthermore, as stated in 20 Tenn. Juris., *Novation* § 3 (1985), "novation must be clearly established by evi-

dence of the discharge of the original debt by express agreement or by the acts of the parties clearly showing the intention to work a novation" [citing *Braly v. Ragsdale,* 3 Tenn.App. 205 (1926); *Gregory v. Beasley,* 7 Tenn.App. 467 (1928); *Dickinson v. Speedway Land Co.,* 294 F. 693 (W.D.Tenn.1923), and *Central State Bank v. Edwards,* 21 Tenn.App. 418, 111 S.W.2d 873 (1937) ]. The record in this case falls far short of meeting the above criteria. Defendant failed to carry the burden of proof placed upon him. There was absolutely no evidence of Bank's intention to release the first master note by the execution of the second master note. Neither Shelby, Crossnoe nor W.H. Spitzer, co-makers of the first master note, was ever aware of the existence of the second master note until the trial below.

█ Having found the absence of a novation, we now consider Defendant's liability under the first master note. As to this note, he asserts lack of consideration as a defense. At the time he signed the first master note in February, 1983, the entire amount of the principal of that note had been paid out by Bank. Furthermore, no new value was given nor was the original maturity date of the master note extended. On the other hand, plaintiff contends that Defendant received consideration in the form of direct benefits, and that even if he did not receive any benefits, Chapter 3 of the U.C.C. does not require the receipt of consideration by an accommodation party in order to hold him liable. From reading the record we can find no evidence of any direct benefit flowing to the defendant as a result of his signing the first master note. To the contrary, he incurred nothing but a substantial detriment.

█ It is clear from the record that the purpose of having Defendant sign the first master note was to lend his credit to the remaining co-makers of the note, particularly the borrowers who had begun a new business. As such, Defendant's status was clearly that of an accommodation maker. Plaintiff therefore contends that pursuant to Chapter 3 of the U.C.C., the liability of

an accommodation party does not depend upon the receipt of any consideration. 47–3–408 reads in part as follows:

> **Consideration.**—Want or failure of consideration is a defense as against any person not having the rights of a holder in due course (§ 47–3–305), except that no consideration is necessary for an instrument or obligation thereon given in payment of or as security for an antecedent obligation of any kind.

The official comments to the U.C.C., case law throughout the United States and U.C.C. authorities reveal that an accommodation party need not receive consideration in order to be held liable on a negotiable instrument. *See* T.C.A. § 47–3–408; *Cissna Park State Bank v. Johnson,* 21 Ill. App.3d 445, 315 N.E.2d 675 (1974); *First National Bank of Jackson v. Carver,* 375 So.2d 1198 (Miss.1979).

The courts of this state, however, have required and continue to require the receipt of consideration by accommodation parties in order to be held liable. A case in point is that of *Capital City Bank v. Baker,* 59 Tenn.App. 477, 442 S.W.2d 259 (1969). In the case at bar, as in *Capital City Bank,* the accommodation party signed a note for which the proceeds had already been distributed. Furthermore, in neither case did the bank make an enforceable promise to extend the time for payment of the obligation owed. Here, as in *Capital City Bank,* defendant incurred a substantial liability while receiving no real benefit for himself or for the co-makers of the original note. We hold that insofar as the first master note is concerned, defendant has no liability due to the absence of consideration.

### C. Defendant's Liability on the Renewal Notes.

■ Again Defendant relies upon the defense of absence of consideration in seeking to avoid any liability under the four renewal notes signed by him on April 30, 1983. In our opinion the facts relative to these notes are distinguishable from the facts surrounding the first master note and the *Capital City Bank* case. The facts that distinguish defendant's execution of these four renewal notes from the master note are that the notes which he signed were renewal notes for notes that were then due and payable. The draw notes which these four notes replaced did not bear the signature of Defendant. The execution of these notes by Defendant enabled Bank to extend the maturity date of these notes from April 29, 1983 to November 15, 1983. This extension of time in which to pay the debt constituted sufficient consideration to impose liability on the notes upon Defendant.

### D. Defenses as an Accommodation Party.

■ T.C.A. § 47–3–606(1) provides as follows:

> **Impairment of recourse or of collateral.** —(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder:
>
> (a) without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person, except that failure or delay in effecting any required presentment, protest or notice of dishonor with respect to any such person does not discharge any party as to whom presentment, protest or notice of dishonor is effective or unnecessary; or
>
> (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

Three of the four renewal notes signed by Defendant stated on the face thereof that each was to be endorsed by W.H. Spitzer and Shelby Crossnoe. Bank did not obtain these endorsements and apparently never intended to do so. Bank claimed that this oversight was a scrivener's error. As a result of this apparent omission, Defendant contends that by virtue of the above-quoted portion of the U.C.C., he is relieved of

liability on these three notes. Each of the notes in question contained the following language:

> **Obligations Independent.** I understand that my obligation to pay this note is independent of the obligation of any other person who has also agreed to pay it. You may release any of us, release any security, waive any rights you might have against any of us, extend new credit to any of us, renew this note, or all of the above, without affecting my obligation to pay the loan amount.

This clause in the renewal notes amounts to a waiver of those defenses sought to be relied upon by Defendant in § 47–3–606. As noted in Official Comment 2 to this section, "[c]onsent may be given in advance, and is commonly incorporated in the instrument ... It requires no consideration, and operates as a waiver of the consenting party's right to claim his own discharge."

If Bank had in fact obtained the signatures of W.H. Spitzer and Mrs. Shelby Crossnoe as endorsers on these notes, the "obligations independent" clause cited above would have empowered it to release either or both of them from the notes at any time without obtaining Defendant's consent and without in any way impairing Defendant's obligation on the notes. From Defendant's point of view it seems to make no difference when or how, short of bad faith, the collateral was reduced or released. The effect—the increase of his potential liability through the decrease of his source of reimbursement—would be exactly the same. We quote with approval the following language from *Etelson v. Suburban Trust Co.*, 263 Md. 376, 283 A.2d 408 (1971), wherein the defendant sought to rely on impairment of collateral as a defense to a suit on a note after the bank failed to perfect its security interest in certain collateral securing a loan. The Maryland Court of Appeals stated:

> [T]he Etelsons by agreeing to the broad language of the endorsement limited the protection to which they might have otherwise been entitled under the UCC. It is clear from the express wording of the endorsement that the Bank could have

released the collateral at any time without notice to the Etelsons and without the release affecting the Etelsons' obligation to pay. It would be illogical to rule that the Bank had a duty to file the financing statement and its failure to do so released the endorsers, when under the endorsement it could have released the collateral with impunity.

*Id.* 283 A.2d at 410. *See also Greene v. Bank of Upson*, 231 Ga. 287, 201 S.E.2d 463 (1973); *American Bank of Commerce v. Covolo*, 88 N.M. 405, 540 P.2d 1294 (1975); *Haney v. Deposit Guaranty National Bank*, 362 So.2d 1250, (Miss.1978); *Executive Bank of Ft. Lauderdale v. Tighe*, 54 N.Y.2d 330, 445 N.Y.S.2d 425, 429 N.E.2d 1054 (1981); *Lafayette Bank & Trust Co. v. Silver*, 58 Misc.2d 891, 296 N.Y.S.2d 926 (1969). *See also White & Summers, Uniform Commercial Code 2d Ed.* §§ 13–15, at 527 (1980).

E. Defendant's Other Defenses.

■ Relying upon T.C.A. § 47–3–115(1), Defendant contends that the renewal notes were "incomplete" notes inasmuch as the endorsements of Spitzer and Crossnoe were never obtained. We find this section to be inapplicable inasmuch as the provisions of T.C.A. § 47–3–114 setting forth the requisite elements of the negotiable instrument had been met.

Defendant next seeks to invoke the provisions of T.C.A. § 47–3–407, claiming that Bank had made a material alteration of the notes. The record contains no proof as to any alleged unauthorized alteration by Bank. This claim is without merit.

■ In addition, Defendant charges that Bank's alleged bad faith and breach of its duty of care toward him released him. T.C.A. § 47–1–102(3) provides that parties may not totally disclaim the obligations of good faith, diligence, reasonableness and care. They may by agreement, however, determine the standards by which the performance of obligations are to be measured. We are of the opinion that Bank did not breach any duty owed to Defendant, because the agreement as incorporated in the notes in question specifically allowed

Bank to release any collateral or any party to the notes. In addition, Chapter 3 of the U.C.C. does not require a lender to disclose information relating to loans or the quality and quantity of the security. The Code simply requires through T.C.A. §§ 47-1-102(3) and 47-1-201(19) that the parties act honestly in the conduct of business. While the record presents several instances of careless banking practices, it does not support a claim of dishonest conduct on the part of Bank. This issue is also without merit.

■ Lastly, Defendant contends that Bank violated T.C.A. § 47-14-117, and in so doing was guilty of unconscionable conduct by charging usurious interest and excessive loan charges. The record indicates that the annual percentage rate of interest charged on the renewal notes was seventeen percent. There is no proof that this rate was usurious. The question of a "late charge" on the loan is another matter. On the face of each note appeared the following language: "If checked I also agree to pay a late charge of five percent of any amount of any installment past due more than fifteen days." We find this language inapplicable for two reasons: first, the box along side this sentence was not checked; and second, this was not an installment payment note.

The notes in question became due November 15, 1983. The record reflects that on several occasions Bank sought to persuade Defendant to pay these notes, which he declined to do. On or about February 4, 1984, Sam T. Lewis who, as vice president of the Bank had served as loan officer for the account, wrote a letter to Defendant advising him that the note would be ninety days past due on February 13, 1984, and that beginning on that date Bank would add as a late charge one-tenth of one percent per day of the then outstanding principal balance until the notes were paid. This late charge would annualize at thirty-six percent.

When Defendant paid Bank $33,000.00 for the convenience store property at the foreclosure sale, Bank deducted as a late charge the sum of $5,785.44 from the proceeds before crediting the balance less attorney fees and advertising costs to the outstanding indebtedness. While Defendant did not plead this Code section as a defense in his answer, the matter was tried below and addressed by the trial court without objection. The trial court held that the late charge of $5,785.44 violated the terms of the contract and disallowed it in full, allowing that amount as a credit against the judgment given Bank against Defendant. We find that Bank's contention in its reply brief that this issue has been raised for the first time in this Court is without merit.

T.C.A. § 47-14-117 reads as follows:

**Usury or excessive charges—Contracts.** —(a) Any contract which on its face requires the payment of usury or excess loan charges, commitment fees or brokerage commissions shall not be enforceable; but the original lender or creditor may sue to recover the principal actually advanced plus lawful interest, loan charges, commitment fees and brokerage commissions.

(b) Where usury or excess loan charges, commitment fees or brokerage commissions do not appear on the face of the contract, but are proved, only the principal plus lawful interest, loan charges, commitment fees and brokerage commissions may be recovered.

(c)(1) Where, however, the court finds that the lender or creditor has been guilty of unconscionable conduct in a transaction by taking interest, loan charges, commitment fees or brokerage commissions in excess of the limitations fixed by statute, that lender or creditor shall not be entitled to recover any interest, loan charges, commitment fees or brokerage commissions with respect to that transaction, and shall be required to refund to the borrower or debtor any loan charges, commitment fees or brokerage commissions and twice the amount of any interest collected with respect to that transaction, and the borrower shall be entitled to recover his reasonable attorneys' fees from the lender.

(2) For the purposes of this section, "unconscionable conduct" shall include, but not be limited to, any calculated violation of statutory limitations on interest, loan charges, commitment fees or brokerage commissions with full awareness of those limitations.

The record reflects no contractual basis whatsoever for Bank's imposing this late charge. Rather, it appears to this Court that after Defendant refused to pay the note, being well aware that he was solvent and readily able to do so and that he had a sizeable investment in the property with no security, Bank concluded that it was in the cat-bird seat, so to speak, and decided to apply what is commonly known as "leverage." The "late charge" as invoked by Bank would increase Defendant's indebtedness at the rate of $933.00 every ten days and clearly was designed to pressure him into paying these notes. We are of the opinion that this action constituted "unconscionable conduct" on the part of Bank.

We affirm the action of the trial court in disallowing the late charge in the amount of $5,785.44. We hold that said amount should be credited against the balance remaining on the indebtedness following the foreclosure. Applying the sanctions provided by 47–14–117(c)(1), we hold that Bank is not entitled to recover any interest accruing on these notes from and after February 13, 1984, the designated beginning date of the so-called "late charge." We are also of the opinion that Defendant is entitled to recover his reasonable attorney fees from Bank in connection with the services rendered by his attorney in voiding the late charge and in successfully relieving Defendant of any accrued interest on the four notes from and after February 13, 1984.

Bank also has appealed the action of the chancellor denying it attorney fees incurred with this action to collect these notes. All four notes call for the payment of reasonable attorney fees if incurred following a default on the notes. The notes were in default. It was error on the part of the chancellor to deny Bank its reasonable attorney fees.

## III. CONCLUSION.

For the foregoing reasons, the judgment of the trial court holding Defendant liable for the full amount of the $4,500 promissory note is affirmed, as is the judgment below that Defendant is not liable on the first master note. We reverse the trial court's holding that the second master note is a novation of the first one.

The judgment of the trial court holding Defendant liable for only one-third of the remaining three notes is reversed. We are of the opinion that Defendant is liable for the full amount of all four notes, less appropriate credits. More specifically, Bank is entitled to a judgment against Defendant in the amount of $61,103.47, which we have arrived at by deducting $32,085, the net proceeds from the foreclosure sale, from the amount of the four renewal notes that matured November 15, 1983, totaling $93,-188.47. In addition, Bank is entitled to judgment for accrued interest on $93,-188.47 from November 15, 1983 to February 13, 1984. We reverse the judgment of the trial court denying attorney fees to Bank for the collection of these notes. This cause is remanded to the Chancery Court of Crockett County for the determination of reasonable attorney fees due Bank's attorney and Defendant's attorney in accordance with the guidelines laid down in this opinion, as well as the determination of the accrued interest due and for such other proceedings that might be had in accordance with this opinion. Costs in this cause are taxed one-half to Bank and one-half to Defendant, for which execution may issue if necessary.

HIGHERS and FARMER, JJ., concur.