IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs, September 8, 2008
Reassigned 2008

**STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v.
BRENNON HARVILLE and JIMMY HARVILLE, SR.**

**Direct Appeal from the Juvenile Court for Hamblen County**
**No. 15360      Hon. Mindy Norton Seals, Judge**

_____ **Filed April 9, 2009** _____

**No. E2008-00475-COA-R3-PT**

_____

The State filed this action to terminate the parental rights of both parents to their three minor
children. Upon hearing the evidence, the Trial Judge terminated the parental rights of both parents
on several grounds. On appeal, we affirm the Judgment of the Trial Court.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Juvenile Court Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which CHARLES D. SUSANO,
JR., J., and D. MICHAEL SWINEY, J., joined.

David S. Byrd, Morristown, Tennessee, for appellant, Jimmy Harville, Sr.

Robert E. Cooper, Jr., Attorney General and Reporter, and Elizabeth C. Driver, Senior Counsel,
Nashville, Tennessee, for appellee, Tennessee Department of Children's Services.

**OPINION**

This appeal arises from the termination of parental rights of appellants Brennon Lei
Harville (Mother) and Jimmy Carl Lynn Harville, a.k.a. Jimmy Lynn Harville, (Father) on February
6, 2008 by Hamblen County Juvenile Judge. The State filed separate Petitions as to the parents'
three children. The children at issue are J.L.H., date of birth 01/24/06, A.D.H. , date of birth
11/20/03, and A.L.H., date of birth 08/30/01.

The petitions averred that the Department of Children's Services was the custodian

of the children who were in foster care at the time of the filing of the petitions to terminate. At the time of the filing of the petition, Mother was incarcerated in the Hamblen County Jail and Father was living in Morristown, Tennessee.

The State alleged numerous statutory grounds for terminating the parents' parental rights. Following trial, the Trial Court's finding of fact are summarized as follows:

1. The children were removed from the care and custody of the parents on or about February 8, 2006 for the safety of the children. JLH was born on January 24, 2006 and he and Mother tested positive of cocaine on that date. Father had also tested positive for cocaine in January 2006 although he later tested negative. The first permanency plan for the children was ratified on March 8, 2006.

2. A CASA report from May 10, 2006 reported that Father was angry and insulting to the CASA representative when he learned that CASA was not going to recommend the children be returned to the parents on a trial placement. Mother had not received a [alcohol and drug] assessment nor a mental health assessment, both of which were included on the permanency plan. Mother was arrested on April, 28, 2006 for DUI, driving with an expired license, violation of parole, violation of registration law and violation of financial responsibility law. Both parents are attending parenting classes which should conclude during May 2006.

3. Minutes from the Foster Care Review Board on December 13, 2006 showed that the Board recommended that the parents' rights be terminated, that Father have drug screening before visits with the children, that the children be removed from Linda Wilson's custody as Bobby Joe Campbell is now living with Ms. Wilson and the children. Campbell has been diagnosed as bipolar, is addicted to drugs and has anger management issues. Based on this report, the court ordered that the circumstances regarding Campbell be investigated, if Campbell is living with Wilson, he must be drug tested and if the drug screen is positive, Wilson must cause him to leave the home or the children will be removed from the home. Further Father is to be drug tested after each visit with children.

4. On July 24, 2007 the court entered the adjudicatory order from the May 10, 2006 hearing, finding the children dependent and neglected at the time of their removal and that they were subjected to a substantial threat of harm if not placed in state custody. [1]

---

[1] Apparently, DCS had not provided a judgment to the court following the hearing and the court did not become aware that a written order had not been entered for over one year.

5.  A review of the parents' progress on the permanency plan was held on March 21, 2007. Father tested positive for cocaine and opiates on that date. The court found that Mother was in rehabilitation. Father told the court that his drug test would be positive for opiates and he acted very inappropriately toward the court. The court held that Father must coordinate all visits with DCS and must have a clean drug test before each visit.

6.  The court reviewed the findings of the hearings on June 27 and July 11, 2007 on Linda Wilson's petition for custody. Mother was in jail at that time, after being arrested on July 5, 2007 for DUI, theft and public intoxication. Father had been bound over to the Hamblen County Grand Jury for possession for sale of Schedule II and III drugs, possession of drug paraphernalia, possession of legend drug, and DUI on July 5, 2007. Father was not supporting the children nor was he providing supplies, money or meals as promised to the children.

7.  Father did not visit his children between March 2007 and June 20, 2007. He visited the children twice, once on June 20, 2007 after a court appearance and on August 9, 2007. Since August he had visited on a more consistent basis except he did not see the children in October 2007, as he was incarcerated for a good part of that month.

8.  The first permanency plan was ratified by the court - the parents were to schedule mental health assessments, sign releases, attend parenting classes and follow recommendations. Mother was to submit to random drug screens, and arrange for an alcohol and drug assessments within two weeks of the plan being made. The plans of February 6, 2007 and August 6, 2007 added that Father would have random drug screens and complete an alcohol and drug assessment. The parties agreed to the provisions in the plans

The Juvenile Court found the following findings of fact specific to Father.

9.  Father's first alcohol and drug assessment recommended that he complete a thirty-day in-patient treatment program but, as he did not believe he needed the treatment, he did not follow through. He completed a second assessment in November 2007 and he was to complete a twelve week out-patient program. He attended one class. Father was to attend parenting class and although he stated that he had completed the classes, he had not done so. Father tested positive of cocaine and opiates on May 10, 2006 and March 21, 2007, he refused a drug test on June 13, 2006. Despite this history, Father testified that he never had a problem with drugs or alcohol except for when he became hooked on opiates following knee surgery. According to Father he had not used cocaine when he tested positive two times at court and he is

not in a drug treatment program but is being "restored" through Christ. Father does not believe he has an anger management problem.

10. Heidi Huenergarde, the DCS case manager, testified that Father attended all permanency plan meetings, was given the Criteria and Procedures for Termination or Parental Rights, had his attorney with him, asked questions and told her that he understood the Criteria. Ms. Huenergarde does not believe Father completed the responsibilities set forth in the plan because he has not provided documentation that he had the mental assessment or that he completed parenting classes. Further, although he had the alcohol and drug assessment, he did not follow the recommendations as he had agreed to do. Father, who had no documentation, testified that he did have the mental assessment and there were no recommendations.

11. Father was indicted on September 24, 2007 for the crimes listed in paragraph six. The trial was set for March, 2008.

12. On November 30, 2007 Father pled guilty in Jefferson County Criminal Court to aggravated burglary and received a six year sentence, to assault and received a sentence of eleven months and twenty-nine days, and to possession of cocaine with intent to sell or deliver and received a sentence of eight years. He was arrested on a Violation of Probation Affidavit (Exhibit 25) on January 24, 2008 while he was in the Hamblen County Juvenile Court for the termination trial. The affidavit states in part that father had violated his probation by not reporting to the Jefferson County Jail to begin service of his sentence on December 17, 2007. Father testified that the affidavit was a mistake because he was given the option to begin New Hope Restoration on December 17, 2007 in lieu of jail, which he accepted. Exhibit 23 states: "May obtain jail credit for successful completion of inpatient treatment at New Hope." Father's sentence was reduced to twelve months incarceration with the balance of the sentence on supervised probation of thirteen years. He was also required to have a drug and alcohol assessment and to comply with the recommendations. At the termination trial Father testified that he was not guilty of these crimes and he only pled guilty "just to get it over".

13. Father's case worker, Jerry Graham, testified at the termination trial and established the following: Father began the New Hope Restoration Program on December 17, 2007. The program is an addiction recovery program that is Christ based. Father is also working on anger management. Father's first two weeks in the program were "touch and go" as he did not want to submit to authority. He had not violated any program rules during the week and a half before the termination trial and Mr. Graham thought Father was willing to disclose the issues he needed to work on to the program. Father has been

negative to three out of four random drug screens while in the New Hope Program. He gets counseling once a week regarding his drug addiction, he attends Bible classes and G.E.D. classes and works in the New Hope thrift shop. Father has completed six weeks of the six month program and Mr. Graham could not predict whether Father would complete the program as about forty percent of the participants do not complete the entire course.

14. Father also testified at the termination trial regarding the New Hope Restoration program. Contrary to Mr. Graham's testimony, Father insisted that the program is not a drug rehabilitation program. Father blamed his problems on the actions of DCS and he believes he "was driven to the criminal charges" by DCS's attorney, Mr. Pettigrew's, actions at the trial on his grandmother's custody petition. He stated his belief that DCS's actions have been as harmful to the children as his serving jail time.

15. Father was incarcerated in December 2007 for failure to pay child support for a child other than the three children at issue here.

The Juvenile Court then addressed its findings of fact pertaining to Mother.

16. Mother was twenty-five years old at the time of the termination trial and was at the Greatstarts treatment facility in Knoxville. She had entered that program on November 27, 2007 and she had been incarcerated on and off for ten months prior to that date. On December 28, 2007, Mother gave birth to a son, Justice, who stayed with Mother at Greatstarts. Mother lives with Justice in a Greatstarts apartment and although there is staff present at the apartment complex, Mother is not supervised in her apartment. Her case worker testified that she is doing well in the program; she has always tested negative to drug screening; she is attentive to Justice; obeys the rules; and is active in therapy sessions. As part of the program Mother gets drug and alcohol therapy two to three times a week, participates in a twelve step program and takes classes in parenting, yoga, coping skills and acupuncture. Her program will last six to nine months and she could stay in the Greatstarts' apartment for up to two years if necessary. The three children in custody with DCS could live with Mother and Justice at Greatstarts. Mother testified that her participation in Greatstarts is voluntary and that she would not be subject to incarceration if she leaves the program before finishing it. The order to transport Mother from the Hamblen County jail to Greatstarts is Exhibit 24 A.

17. Ms Huenergarde provided the following history regarding Mother. Mother executed the permanency plan on February 24, 2006 wherein she agreed to have an alcohol and drug assessment on March 21, 2006. She did not keep

that appointment and when another appointment was made for April 26, 2006, she likewise did not show up. She was arrested on April 28, 2006 for a violation of probation. She completed the drug and alcohol assessment on June 16, 2006. She was incarcerated from August 17, 2006 to November 20, 2006 and she completed a twenty-one day in-patient program for drug addiction at Center Pointe during this incarceration. She was arrested again during March 2007 and was transported to the Buffalo Valley treatment facility for another in-patient treatment program. She absconded from this facility and failed to report back to the Hamblen County Sheriff's Department as she had been ordered to do. She was "on the run" from March 21, 2007 to July 5, 2007 and during that period she did not contact DCS. According to Ms. Huenergarde, Mother blamed DCS for her using cocaine in March 2007 because DCS had placed her children with her parents, the Aguirres, and Mother also lived there and DCS gave Mother no assistance.

18.    Exhibits 24C - 24M provide a history of Mother's criminal history:

| March 26, 2007 | violation of probation granted on February 1, 2005 for theft, public intoxication, disorderly conduct and D.U.I; warrant for arrest ordered |
| --- | --- |
| March 12, 2007 | violation of probation; sentence of 11 months and 29 days; 100% to be served and consecutive to 550B0T |
| August 16, 2006 | violation of probation; sentence of 11 months and 29 days; 100% to be served |
| June 7, 2006 | revocation of Title 40 deferment |
| June 6, 2006 | violation of probation; sentence of 11 months and 29 days; 100% to be served on house arrest |
| December 4, 2004 | plea of guilty to public intoxication, and disorderly conduct; Title 40 granted; placed on probation |

19.    Mother testified that she had used cocaine since 2001 and that she abused prescription drugs. When she was arrested in 2005, she was under the influence of prescription drugs and she committed theft at WalMart. Her children were with a babysitter at the time. During part of the time her children were placed with her parents, the Aguirres, she lived there also. She used drugs with her parents once during that time and she described her parents as "pill heads". She stated that she had four drug and alcohol assessments, had completed an in-patient program at Center Point, completed

aftercare at New Hope and had completed parenting classes. As part of her aftercare she was to go to counseling at Cherokee Health Systems but she only went one time. She relapsed and began to abuse drugs again. She was then ordered by the court to be admitted to Buffalo Valley but she left there after two weeks without permission and she was AWOL from March 25, 2007 until she was arrested on July 5, 2007. Mother did not see her three older children from March 2007 to December 28, 2007. Mother was in labor during the December 2007 visit with the children at Greatstarts so the visit only lasted thirty minutes. Ms. Huenergarde, who was present, stated that Jimmy did not know his mother. Mother would like the three older children to join her and Justice at Greatstarts.

20. Mother is not employed and she has no income. She depends on Father for financial support. She did not know she was supposed to pay child support but she claimed that she bought diapers, clothes and toys for her children when they were placed with relatives.

21. The children have been placed in three non-relative homes since they have been in DCS custody. They were with relatives until July 11, 2007; they were in a foster home in Maryville for a short period, until July 24, 2007; they were placed in a second foster home until October 5, 2007. Since that time they have been in a pre-adoptive foster placement and they seem close to their foster mother. The children are in dance class and participate in school activities. DCS has placed an in-home service provider in the foster home to assist the foster parents and children with problems they have experienced. Some of the problems are that ALH tells lies that are sometimes hateful; A.D.H. has hurt herself and tried to strangle JLH and an animal. JLH is developmentally delayed but he is improving.

The Juvenile Court then found several statutory grounds for termination of the parents' rights, and that it was in the best interest of the children and decreed termination of the parental rights as to the three children.

The issues presented for review are:

A. Did the Juvenile Court err when it found that the mother exhibited wanton disregard for the welfare of the children?

B. Did the Juvenile Court err when it found that persistent conditions existed as to both the father and the mother?

C. Did the Juvenile Court err when it found that the father and the mother had abandoned the children by failing to provide a suitable home?

D. Did the Juvenile Court err when it found substantial noncompliance with the permanency plan on the part of father?

E. Did the Juvenile Court err when it found that the father had abandoned his children by failing to visit and/or support them?

This Court reviews the decisions of a trial court sitting without a jury *de novo* upon the record. *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002). There is a presumption of correctness as to the trial court's findings of fact, unless the preponderance of evidence is otherwise. *Id.;* Tenn. R .App. P. 13(d). The trial court's conclusions of law are reviewed under a purely *de novo* standard with no presumption of correctness. *Taylor v. Fezell,* 158 S.W.3d 352, 357 (Tenn. 2005). This Court reviews credibility determinations made by the trial court with great deference, *Keaton v. Hancock County Bd. of Educ.,* 119 S.W.3d 218, 223 (Tenn. Ct. App. 2003), because the trial court is in the best position to resolve factual issues that hinge on credibility. *Hopper v. Moling,* No. W2004-02410-COA-R3-CV, 2005 WL 2077650 at *7 (Tenn. Ct. App. Aug 26, 2005).

Tennessee Code Annotated Section 36-1-113 governs the termination of parental rights and provides that the termination of parental rights must be based on a finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established and that termination of the parent's rights is in the bests interests of the child. Tenn. Code Ann. § 36-1-113(c) (2005).

The governing statutes require that one seeking to terminate parental rights must establish at least one statutory ground for termination. Tenn. Code Ann. § 36-1-113(c)(1)(2005); *M. D. E. ex rel. M. E. G. v. J. J. C.,* No. E2006-00942-COA-R3-PT, 2007 WL 1958643 at * 3 (Tenn. Ct. App. July 6). Once a court finds that clear and convincing evidence proves the existence of at least one statutory ground, the inquiry then shifts to the child's best interests as set forth by Tenn. Code Ann. § 36-1-113(I). If the court concludes that termination is in the child's best interest, then the entry of a termination order is appropriate. *In re B. P. C.*, at * 6.

Neither Mother nor Father has appealed the Juvenile Court's finding that termination of the parents' rights were in the best interest of the children. Accordingly, that prong of the determination to terminate the parental rights need not be addressed by this Court. *Melton v. Melton*, No. M2001-00128-COA-R3-CV, 2004 WL 63437 at *3 (Tenn. Ct. App. Feb 22, 2004). *Also see, Bing v. Baptist Memorial Hospital-Union City,* 937 S.W.2d 922, 924 (Tenn. Ct. App.1996); *Bank of Crockett v. Cullipher,* 752 S.W.2d 84, 86 (Tenn. Ct. App.1988).

In this case the Juvenile Court relied on three statutory grounds in terminating Mother's parental rights and four grounds in terminating Father's parental rights.

The Juvenile Court was correct in terminating Mother's parental rights based on a finding by clear and convincing evidence that Mother had abandoned the children due to her

incarceration at the time of the filing of the termination petition on August 23, 2007 and upon a finding that Mother's actions constituted wanton disregard for the welfare of the children. Tenn. Code Ann § 36-1-102 (1)(A)(iv) provides that for purposes of terminating the parental rights of parents of a child to that child in order to make that child available for adoption, "abandonment" means that:

> (iv) A parent . . . is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child . . . .

It is undisputed that Mother was incarcerated on August 23, 2007 when the termination petition was filed. The first criteria for abandonment under section 36-1-102 (1)(A)(iv) was met. *See, In Re Audrey S. And Victoria L,* 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005). The Juvenile Court then found the Mother's behavior prior to incarceration constituted wanton disregard for the welfare of the children. The Court based that finding on a laundry list of examples of Mother's exceptionally poor judgment and bad acts that affected the children starting with the fact that she used cocaine when pregnant with J.L.H. and that she and J.L.H. tested positive for cocaine at the time of the child's birth. The Trial Court also found that Mother's delay in getting an alcohol and drug assessment, failure to complete drug rehabilitation until such time as she was incarcerated and ordered by the Court to attend the program and her failure to complete the requirements of aftercare showed wanton disregard for the welfare of the children. The fact that Mother used cocaine and opiates after being release from the drug rehabilitation program and that she blamed DCS for her relapse were also factors that contributed to the Trial Court's finding of abandonment based on wanton disregard. Mother's criminal history, repeated violation of probation, incarcerations and the fact that she absconded from a court ordered rehabilitation were also strong indicators to the Trial Court that Mother had wanton disregard for her children's welfare prior to the time the termination petition was filed.

The evidence supports the Trial Court's fact finding. *See, In re Audrey S.*, 182 S.W.3d at 867-868; *See also M.D.E. ex rel. M.E.G. v. J.J.C.*, No. E2006-00942-COA-R3-PT, 2007 WL 1958643 at * 3 (Tenn. Ct. App. July 6, 2007)*perm. to app. denied.*

Here DCS proved by clear and convincing evidence that all of these elements that have been held to show wanton disregard for a child's welfare and more, including the cocaine she exposed J.L.H. to in utero, were present. We affirm the Trial Court's finding that Mother displayed a wanton disregard for the welfare of her children.

The Juvenile Court also found that Father had failed to remedy the conditions that were the cause of the removal of the children from his custody and that those conditions still

persisted and were unlikely to be remedied at an early date. Further the Trial Court found that a continuation of the father/child relationship would greatly diminish the chances of the children being placed in a safe and stable home. Tenn. Code Ann. § 36-1-113(g)(3)(A) provides that a court may terminate parental rights when:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
>> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>>
>> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>>
>> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . .

The Juvenile Court held that DCS had proved this ground as to Father by clear and convincing evidence based upon the following: (1) the children had been in the custody of the State for more than six months; (2) the children were originally removed from the parents due to the parents testing positive for cocaine and were found by the Court to be neglected and dependent; (3) Father had persisted in testing positive for cocaine and had been convicted of possession of cocaine for sale or delivery in Jefferson County and similar charges were pending against him in Hamblen County; (4) the conditions of Father's illegal drug use and his criminal convictions and pending criminal charges along with the fact that he was arrested on January 24, 2008, still existed and, in all reasonable probability, would lead to further neglect or abuse of the children; and (5) there is little chance that those conditions would be remedied at an early date. The Trial Court noted that the children had been in State custody for twenty-three months and that Father had ample time to rehabilitate himself so that he could parent his children. The Court held that continuation of the parental relationship would greatly diminish the chances of the children being placed in a safe, stable and permanent home and that they were already placed in a pre-adoptive home. Moreover, the Court found that DCS had made reasonable efforts to assist Father as it had compiled a permanency plan and discussed it with Father, paid for a drug assessment, paid for the one class Father consented to attended at the Bendell facility, paid for Father's drug screens, and was available to schedule and supervise Father's visitation with the children. The Court noted that DCS had reiterated to Father that he must complete parenting classes and obtain a mental health assessment and had given him the names of providers for these services.

The evidence presented at trial supports the Trial Court's determination that the conditions that led to the removal of the children were not remedied by Father and still persisted at the time of trial and that all of the statutory factors for this ground for termination of parental rights were met. We give great deference to the Trial Court's determination of credibility, and the conditions that triggered removal of the children remain, and the that the use of illegal drugs persisted with Father.

We note that at the time of trial it was uncertain how long Father would have to spend incarcerated. At the end of the second day of trial he was jailed for violation of probation in connection with his drug possession and assault conviction in Jefferson County, which carried an eight year sentence. Additionally, he was facing charges for possession of illegal drugs in Hamblen County, which he intended to plead guilty to. Based upon these facts there was little likelihood Father could establish a safe, stable and drug-free home for the children to return to at an early date or even in the near future.

The Juvenile Court did not err when it held that DCS proved all three prongs of Tenn. Code Ann. § 36-1-113(g)(3) by clear and convincing evidence and when it terminated Father's parental rights.

We pretermit discussing the remaining issues, as above indicated, and affirm the Judgment of the Trial Court and remand, with the cost of the appeal assessed jointly and severally to Brennon Lei Harville and Jimmy Carl Lynn Harville, a/k/a Jimmy Lynn Harville.

_____
HERSCHEL PICKENS FRANKS, P.J.

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE

### STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v. BRENNON HARVILLE and JIMMY HARVILLE, SR.

**Juvenile Court for Hamblen County**
**No. 15360**

**Filed April 9, 2009**

**No. E2008-00475-COA-R3-PV**

---

**JUDGMENT**

This cause was regularly heard and considered by the Court. IT IS NOW ORDERED that the judgment of the Trial Court is affirmed, and the cause remanded. The costs of appeal are adjudged jointly and severally to Brennon Lei Harville and Jimmy Carl Lynn Harville, a/k/a Jimmy Lynn Harville, for which execution may issue if necessary.

PER CURIAM

-12-