IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 26, 2013 Session

## HEALTHMART USA, LLC and GREGG LAWRENCE v. DIRECTORY ASSISTANTS, INC.

**Direct Appeal from the Chancery Court for Williamson County**
**No. 35721      James G. Martin, III, Chancellor**

---

**No. M2012-00606-COA-R3-CV - Filed April 29, 2013**

---

This is the second appeal of this case, involving the question of whether Appellant acted in good faith in seeking to enforce an arbitration clause in a consulting contract, which was entered by and between Appellant and Appellee. The trial court determined that Appellant failed to act in good faith in unilaterally demanding arbitration in a forum of its choice, in setting an arbitrary deadline, and then in unilaterally accelerating the deadline. We affirm the decision of the trial court that Appellant breached the duty of good faith and remand with instructions to consider whether Appellant's lack of good faith operates as a waiver of its right to seek arbitration pursuant to the contract.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded with Instructions**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M., KIRBY, J., joined.

Cynthia Sherwood McKenzie and Anton L. Jackson, Nashville, Tennessee, for the appellant, Directory Assistants, Inc.

Phillip Byron Jones, Nashville, Tennessee, for the appellees, Healthmart USA, LLC and Gregg Lawrence.

## OPINION

A full recitation of the facts and procedural history relevant to the first appeal is contained in this Court's opinion, ***Healthmart USA, LLC v. Directory Assistants, Inc.***, No. M2010-00880-COA-R3-CV, 2011 WL 1314662 (Tenn. Ct. App. April 6, 2011) ("***Healthmart I***"). In the interest of continuity, we will briefly review those facts here.

Appellant Directory Assistants, Inc. ("DAI") is a Connecticut based corporation, specializing in consulting services. *Healthmart I*, 2011 WL 1314662, at *1. DAI reviews Yellow Page books from different states to identify prospective clients who place advertisements in the Yellow Pages and incur expenditures in excess of the revenues resulting from such advertisements. DAI then uses telemarketers to contact these prospective clients to set up appointments with account representatives. DAI advises the potential clients that DAI will receive no fee unless the client saves money on Yellow Page advertising. If savings are achieved, DAI is then paid a percentage of those savings. David Ford is the owner and president of DAI. Michael Cody is DAI's vice president in charge of sales. Carl Staggers is the general manager of DAI; he handles the day-to-day operations and administration of the company, including maintaining DAI's business records. Dan Cassin is a DAI account executive.

Healthmart USA, L.L.C. ("Healthmart") is a Tennessee-based insurance brokerage company, which has been in business since 2003. Gregg Lawrence (together with Healthmart, "Appellees") is the founder/owner of Healthmart. It is undisputed that, at all times relevant, DAI existed as a corporate entity in good standing with the Tennessee Secretary of State.

The relationship between Healthmart and DAI began in early 2008, when a telemarketer at DAI called Healthmart to offer DAI's services. Mr. Lawrence agreed to a meeting and, in February 2008, Mr. Cassin traveled to Tennessee to meet with Mr. Lawrence. At that time, Mr. Cassin left a brochure and a proposed consulting contract with Mr. Lawrence for his consideration. On March 3, 2008, DAI entered into a "consulting contract" with Healthmart. The following provision of the contract was at issue in the first appeal:

> Should a dispute arise we both agree to try and resolve it with the other party. If we cannot, we both want to resolve it quickly and cost effectively. To achieve that, we both agree to resolve any dispute arising out of or relating to this contract through confidential binding arbitration and agree to mutually choose an arbitration service, location and choice of law forum. If we are unable to come to a mutual agreement, or if one of us refuses to participate in choosing, the party filing a demand will have the right to make the choices unilaterally, as long as the filing party made a good faith effort to come to a mutual agreement, and the non-choosing/non-participating party expressly consents to and waives any and all objections to the choices made.

The dispute that gave rise to DAI's filing a demand for arbitration under the foregoing clause arose out of an invoice that DAI sent to Healthmart. The invoice, dated October 31, 2008 and admitted into evidence, shows a balance of $20,930.70, which DAI alleges it was owed by Healthmart. Upon receipt of the invoice, on or around November 4, 2008, Mr. Lawrence called Mr. Cassin to explain his position that Healthmart did not owe DAI any money because Mr. Lawrence had "cancelled [the] ad before what they call their strategic process took place, which is on one level, one of the things that would generate a fee within the DAI contract . . . [a]nd since [he] cancelled the advertising before that strategic process took place . . . anything that was done after that decision was made was not covered under the contract." According to Mr. Lawrence's testimony, Mr. Cassin agreed with him. Several emails passed between the two companies, *see* discussion *infra*. However, DAI continued to maintain that the invoice was owed; Healthmart continued to dispute the charges. Thereafter, on February 27, 2009, DAI unilaterally filed an arbitration complaint with the American Dispute Resolution Center in Connecticut ("ADR"). In a letter dated March 23, 2009, the ADR notified Healthmart that the arbitration "must proceed" absent a court order enjoining it and that Healthmart should select an arbitrator "today" or one would be appointed. *Healthmart I*, 2011 WL 1314662, at *1.

On March 25, 2009, Appellees filed a lawsuit against DAI in the Williamson County Chancery Court, seeking a declaratory judgment and civil damages under the Tennessee Consumer Protection Act. *Healthmart I*, 2011 WL 1314662, at *1. Appellees obtained a temporary restraining order preventing continuation of the arbitration. On April 22, 2009, DAI filed a notice of removal to federal court. Appellees filed a motion to have the case remanded back to chancery court, which was granted on the basis that the defendants failed to establish that the amount in controversy exceeds $75,000. *Id*. at fn.2. Upon remand to the chancery court, DAI filed a motion to dismiss or, in the alternative, to stay the action and compel arbitration. *Id*. at *2. A hearing was held on March 29, 2010. The trial court denied DAI's motions, finding the last sentence of the arbitration provision "ambiguous and subject to multiple interpretations." *Id*. At the hearing, the parties debated the meaning of the final clause in the last sentence of the arbitration provision: "and the non-choosing/non-participating party expressly consents to and waives any and all objections to the choices made." *Id*. DAI insisted that the final clause of the last sentence is not a requirement, but means that the non-choosing/non-participating party consents to and waives all objections to the choices made by virtue of not participating in the selection process. *Id*. However, the trial judge concluded that the last sentence could be read to mean that the party filing a demand cannot make the choices unilaterally unless the non-choosing/non-participating party expressly consents to and waives all objections to the choices made. *Id*. The court denied DAI's motion to dismiss, denied its request that the Appellees' civil claims be stayed, and denied its request that the Appellees be compelled to arbitrate the claims. *Id*.

On April 19, 2010, DAI filed its first appeal to this Court. DAI also filed a motion in the chancery court to stay the matter pending appeal. The court granted DAI's motion to stay on May 29, 2010.

In *Healthmart I*, this Court held:

> We do not think the provision at issue may reasonably be read to have more than one meaning. We interpret the provision to provide that if the parties are unable to come to a mutual agreement or if one party refuses to participate in choosing an arbitration service, location, and choice of law forum, then the non-participating party consents to and waives any and all objections to the choices made, as long as the party filing for arbitration made a good faith effort to come to a mutual agreement. Interpreting the provision in the way that Healthmart suggests would put two parts of the provision at odds—allowing the filing party to act unilaterally but requiring the non-participating party to waive all objections to the choices made. Such a requirement would preclude unilateral action.

*Healthmart I*, 2011 WL 1314662, at *4. After reaching the foregoing conclusion, the *Helathmart I* Court then turned to the record to determine whether DAI had acted in good faith in seeking arbitration.

After reviewing the evidence, the *Healthmart I* Court concluded that the sparse amount of evidence in the record was insufficient. Specifically, the Court held that, "[w]ithout a full account of the parties' correspondence and negotiations, the record is unclear at this stage whether DAI made a good faith effort to come to a mutual agreement." *Healthmart I*, 2011 WL 1314662, at *5 . Accordingly, the Court remanded the case to the trial court "for a ruling on the condition precedent to arbitration: whether the appellant made a good faith effort to come to a mutual agreement before unilaterally selecting an arbitration service, location, and choice of law forum." *Id*. at *1.

Upon remand, the trial court held an evidentiary hearing on November 28, 2011. At the outset of the hearing, the trial court defined the issue as "whether or not [DAI] has made a good faith effort to come to a mutual agreement concerning arbitration." The evidence at the hearing included: (1) the testimony of Carl Staggers, the general manager of DAI; (2) the testimony of Gregg Lawrence; (3) various records of both DAI and Healthmart, including emails and database entries. Notably, neither David Ford, the owner and president of DAI, nor Michael Cody, DAI's vice-president in charge of sales, testified at the hearing.

-4-

Following the hearing, the court took the matter under advisement.

On March 9, 2012, the trial court entered a memorandum and order, in which it specifically held that the testimonies of Messrs. Staggers and Lawrence were credible. Based upon the record, the trial court held that "DAI has not shown that it made a good faith effort to come to a mutual agreement before unilaterally selecting an arbitration service, location, and choice of law forum." Rather, the trial court specifically found that DAI had acted in "bad faith" and that it had attempted to "unconsciously take advantage of Healthmart," and that its conduct indicated a "lack of honest dealing." As grounds for its finding that DAI displayed a lack of good faith, the trial court relied upon the following facts: (1) that "DAI[] fil[ed] for arbitration without ever having a telephone conversation with Healthmart regarding the disputed invoice or the selection of the arbitration particulars;" and (2) that DAI "arbitrarily set[] a deadline for Healthmart to respond to its emails or face arbitration in a location and with a service and choice of law of DAI's choice, and then arbitrarily accelerat[ed] that deadline."

DAI appeals, rasing two issues as stated in its brief:

1. Whether the trial court erred in finding that Appellant did not exercise good faith in attempting to come to a mutual agreement before unilaterally selecting arbitration particulars.

2. Whether the parties are required to arbitrate even if Appellant failed to exercise good faith prior to unilaterally filing [for arbitration] in Connecticut.

We note that the trial court made extensive findings of fact in its March 9, 2012 order, which is twenty-five pages in length. Because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d). Furthermore, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See **McCaleb v. Saturn Corp.**,* 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker**,* 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***Whitaker**,* 957 S.W.2d at 837; *see also **Walton v. Young**,* 950 S.W.2d 956, 959 (Tenn. 1997).

This appeal addresses only the question of whether DAI acted in good faith in filing for arbitration in Connecticut. It is well-settled in Tennessee that "'the common law imposes a duty of good faith in the performance of contracts.'" *Dick Broadcasting Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, No. E2010-01685-SC-R11-CV, —— S.W.3d ——, 2013 WL 175491, at \*4 (Tenn. Jan. 17, 2013) (quoting *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996)). Our Supreme Court has reiterated that "'[i]t is true that there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law.'" *Id.* (citations omitted). The duty of good faith, however, does not extend beyond the terms of the contract and the reasonable expectations of the parties under the contract. *Id*. at \*9. The obligation of good faith and fair dealing does not create additional contractual rights or obligations, and it cannot be used to avoid or alter the terms of an agreement. *Id*. However, parties to a contract may insert provisions into the agreement, describing the parameters of fair dealing and good faith. These provisions, if included, are generally enforceable as reflecting the bargained-for intent of the parties. *See Wallace*, 938 S.W.2d at 686 (observing that contracting parties "'may by agreement . . . determine the standards by which the performance of obligations are to be measured.'") (quoting *Bank of Crockett v. Cullipher*, 752 S.W.2d 84, 91 (Tenn. Ct. App. 1988)). The contract in this case is silent on this point, leaving the resolution of the ensuing conflict to the courts. The Tennessee Uniform Commercial Code, which is relied upon by each party in its respective brief, defines "good faith" as "honesty in fact in the conduct of the transaction concerned." Tenn. Code Ann. §47-1-201(19). As set out in the Restatement (Second) of Contracts, Duty Of Good Faith And Fair Dealing § 205, comment a (2012), what constitutes good faith, and breach thereof, will vary based upon the particulars of each contract and the facts of each case:

> Good faith is defined in Uniform Commercial Code § 1-201(19) as "honesty in fact in the conduct or transaction concerned." "In the case of a merchant" Uniform Commercial Code § 2-103(1)(b) provides that good faith means "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness. The appropriate remedy for a breach of the duty of good faith also varies with the circumstances.

-6-

*Id*. Accordingly, the question of whether a party acted in good faith is a question of fact. ***Dick Broadcasting Co.***, 2013 WL 175491, at *14.

Turning to the record, we note that the majority of the relevant facts are contained in emails that were sent between DAI and Healthmart. As noted above, the dispute between these parties arose from an invoice that was sent to Mr. Lawrence on October 31, 2008. According to his testimony, which was deemed credible by the trial court, upon receipt of this invoice, Mr. Lawrence immediately contacted Mr. Cassin, on or around November 8, 2008, to dispute the alleged balance of $20,930.70. Trial Exhibit 2 is an Account Summary Report, which is generated by DAI on each of its accounts and relates to DAI's dealings with Healthmart. According to Mr. Staggers's testimony, any emails sent by the company are recorded on the account summary. Also, any notations concerning billing status, phone conversations, etc. is also recorded in these summaries. After the initial invoice was sent by DAI and Mr. Lawrence called to dispute the invoice, the account summary indicates that Mr. Lawrence was not contacted again until Mr. Cassin emailed him on January 8, 2009. However, this email does not mention any payment due from Healthmart. Also on January 8, 2009, Mr. Staggers sent an internal email to Michael Cody, stating his belief that a decision had been made not to pursue Healthmart regarding DAI's invoiced claim relating to the Nashville Yellow Pages advertising. The email indicates that a form, known as the "Strategic Process and Educational Form," had never been received from Healthmart. On January 15, 2009, Mr. Staggers sent another email to Mr. Cody, indicating that a decision needed to be made on how DAI would proceed on the Healthmart account. At that point, DAI had discovered that Healthmart had not changed its information in either the White Pages or Yellow Pages for the Franklin directory, so there was some question as to whether Healthmart had used DAI's services and, if so, to what extent. Both Messrs. Cody and Staggers then spoke with Mr. Ford on January 15, 2009. Following that conversation, Mr. Ford emailed Mr. Lawrence, on Jan. 15, 2009, stating that Mr. Ford had "been given [the Healthmart account] to begin arbitration proceedings." This email further states: "Per the arbitration agreement, please let me know where you feel we should arbitrate, what service we should use, and what choice of law you feel should apply." Mr. Ford then writes: "If we do not hear from you by January 22, 2009, we will make the choices unilaterally." By email of January 30, 2009, Mr. Staggers notified Mr. Ford that he had not heard from Mr. Lawrence. Mr. Ford then emailed Mr. Lawrence again on February 9, 2009, reiterating that DAI would seek arbitration if it did not hear from Mr. Lawrence.

The account summary indicates that, at the direction of Mr. Ford, Mr. Staggers called Healthmart on February 12, 2009 "to see if Healthmart was still there." Mr. Staggers made the call and spoke with Craig Lawrence, Gregg Lawrence's brother. Mr. Staggers asked that Gregg Lawrence return his call. Mr. Lawrence testified that he did not receive Mr. Staggers's message and, accordingly, did not return the call. Rather than calling Mr.

Lawrence again, the account summary indicates that Mr. Staggers called Mr. Tom Henninger, the Yellow Pages representative for Healthmart, to inquire about Healthmart's business operations. According to Mr. Staggers's testimony, Mr. Henninger stated that he was not sure if Healthmart was still in business. At that point, DAI placed a new designation on Healthmart's account, "qualify the account," which means that DAI would try to determine whether Healthmart was still in business. Mr. Staggers also contacted Mr. Cassin to ask what Mr. Cassin remembered about Healthmart when he visited the company. In response, Mr. Cassin emailed Mr. Staggers on February 12, 2009, stating that Mr. Lawrence "talks a game, but basically is a sole prop. focusing on health insurance clients. He noted that he had some business clients, would like more—but mostly individual health insurance products." The email goes on to describe Mr. Lawrence as an "[a]nalytical type, but does not focus either a) disorganized with time, etc. or b) deliberate-sly as a fox. Personally, I wouldn't leave my wallet on the table and step away for a minute."

On February 13, 2009, Mr. Ford sent an email to Mr. Lawrence, stating:

> We cannot make you respond to this. However, we will proceed with an arbitration against you personally, as we have not been able to find any corporate entity named Healthmart USA. . . . We will have seventeen years to collect on the judgment.
>
> If you don't try and work with us to resolve this, you are going to force us to take that route. If we do not hear from you by March 1, 2009, we will file a demand for arbitration.
>
> Would you help us avoid this by responding?

On February 16, 2009, Mr. Lawrence emailed Mr. Cassin concerning Healthmart's Franklin Yellow Pages advertisement. Mr. Lawrence's email does not mention any dispute concerning the invoice or arbitration. Mr. Lawrence received no response to this email from Mr. Cassin, or anyone else at DAI until February 20, 2009, when Mr. Ford emailed Mr. Lawrence, stating, in relevant part:

> Thank you for your email of February 16th. Perhaps you did renew your Franklin book. However, you did not renew the Nashville book. This was explained to you [o]n November 4, 200[8].
>
> We would like to resolve this matter with you, if at all possible. However, avoiding your obligation is not one of the options that

-8-

will resolve the matter. Please let me know how you would like to resolve this matter by March 1. If we do not hear from you by then, we will ask a third party to resolve it for us . . . .

Although Mr. Staggers testified that it was DAI's practice to send monthly invoices to customers with outstanding balances, the record indicates that, after the October 31, 2008 invoice was sent, Mr. Lawrence received no further invoices until February 20, 2009. This invoice, which was admitted as trial Exhibit 3, shows a balance of $21,777.10, which includes finance charges. Upon receipt of this invoice, Mr. Lawrence wrote on it: "Gentlemen, I do not owe this money per my conversation with Dan Cassain [sic] Oct. 2008." Mr. Lawrence then sent the invoice, with notation, to DAI via facsimile. In addition, Mr. Lawrence testified that he left phone messages for Mr. Cassin on February 25 and 26, asking Mr. Cassin to call him, but he never heard from Mr. Cassin.

Rather, after Mr. Lawrence sent the facsimile response to the February 20th invoice, Mr. Ford emailed him, stating: "Simply writing a note that says you do not owe the money does nothing to let us know why you feel you do not owe the money. Could you please tell us why you feel you should not have to honor your contract? If we cannot resolve this by tomorrow, we will have to file a demand for arbitration." This email is dated February 26, 2009. Within two hours of this email, Mr. Lawrence responded: "I talked to Dan about the fact that I canceled my yellow page ad. You should speak with him." Mr. Ford immediately responded to Mr. Lawrence, stating: "This is not a coy game of hide and seek. If you have a reason you did not pay your bill, tell me. Otherwise, we don't take any stock in 'go ask so and so' claims. If you have a legitimate reason, let us know. If not, then pay your bill."

In response to the foregoing emails from Mr. Ford, Mr. Lawrence emailed Mr. Cassin, stating: "David Ford from you company is sending me somewhat threatening emails regarding a bill he claims I owe to your company. As far as I know, I don't owe your company anything. If you think I do, please call me. If not, then please tell him to quit sending these emails. This is not a good way to start a relationship." Mr. Cassin forwarded this email to Mr. Ford, who responded to Mr. Lawrence: "I will be responding to any attempts to contact our company. This is not the start of a relationship. You have entered into a contract with us a year ago. You owe for savings in the Nashville book based on the cost saving changes you made. You received a bill months ago. Why do you think you should not have to pay for the savings per the terms of the contract you signed?" Mr. Lawrence sent a reply email to Mr. Ford on February 27, 2009, stating:

I am requesting the courtesy of a phone call from Dan Cassin who is my account rep and knows the history of my interactions with your firm, and who I have already discussed this matter

with. You are welcome to join him on the call. I will be in the office most of the day on Monday. Just let me know what time you want to call so that I can put that on my schedule.

Mr. Lawrence also sent an email to Mr. Cassin on February 27, 2009, requesting that Mr. Cassin call Mr. Lawrence. Specifically, Mr. Lawrence states:

I called you back in October about a bill I received from you guys for $20,000. We both agreed that I didn't owe any money as I had canceled my ad and did not take your recommendations. No one from your company has called Healthmart since last April about this or any other matter. Mr. Ford's emails have been decidedly less than professional and he says he is filing some type of motion against my company. I need you to get this straightened out Monday before this goes any farther.

The next email, sent on February 27, 2009, from Mr. Ford to Mr. Lawrence states only: "We have filed a demand today. We would be happy to hear what you have to say Monday." Mr. Lawrence replied: "Okay, what time will you be calling me,"to which Mr. Ford replied: "What time would you like to be called." On February 28, 2009, Mr. Lawrence emailed Mr. Ford, stating: "You and Dan need to call me at 2 PM CST Monday at my office. My attorney will be present for the call and Dan Cassain [sic] MUST also be on the call. We will be resolving any issues you may have on this phone call Monday." Mr. Ford replied: "We will call you at two because it is the right thing to do. However, stop making demands about what we MUST do. We filed a demand for arbitration against your company. The only thing we MUST do now is prove our case to an arbitrator . . . ." Mr. Ford then sent an email, stating that DAI's offices were closed on Monday, February 28, "due to a blizzard," and that DAI would have to make the call on Tuesday. The dispute over the October 2008 invoice demand remained unresolved, and Healthmart filed suit.

Based upon the evidence, the trial court concluded, in its March 9, 2012, order that:

DAI has not shown that it made a good faith effort to come to a mutual agreement before unilaterally selecting an arbitration service, location, and choice of law forum.
First, DAI's filing for arbitration without ever having a telephone conversation with Healthmart regarding the disputed invoice or the selection of the arbitration particulars indicates a lack of good faith. Mr. Ford's January 15 email to Mr. Lawrence is the only correspondence between the parties in

-10-

which the arbitration particulars are discussed.[1]

\*                          \*                          \*

In contrast to Mr. Ford, Mr. Lawrence attempted to discuss the disputed invoice with DAI by placing calls to Mr. Cassin, the only DAI employee with whom Mr. Lawrence had in person contact . . . .   Mr. Cassin never returned Mr. Lawrence's phone calls.  On February 25, Mr. Lawrence also faxed the February statement back to DAI along with a note disputing the October 2009 invoice.   Mr. Lawrence also emailed Mr. Ford on the morning of [] February 27, before DAI filed for arbitration, asking for a courtesy call from Mr. Cassin. Neither Mr. Cassin nor Mr. Ford called Mr. Lawrence on February 27.  Rather, DAI filed its demand for arbitration.

\*                          \*                          \*

Second, DAI displayed a lack of good faith by arbitrarily setting a deadline for Healthmart to respond to its emails or face arbitration, in a location and with a service and choice of law of DAI's choice, and then arbitrarily accelerating that deadline.  In his February 13 email, Mr. Ford stated that DAI would commence arbitration proceedings against Healthmart unless Healthmart responded by March 1.  There was no mention of the

---

[1] The record indicates that some of the emails sent on February 13, February 20, and February 26 went into Healthmart's "spam" folder, which explains the lack of response on Mr. Lawrence's part, *see supra*.  Concerning the "spam" emails, the court's March 9 order states:

> DAI does not cite, nor is the Court aware, of any binding or persuasive authority that holds that an email recipient whose email service deflects emails to the recipient's spam folder is responsible for the failure to receive the email and not the sender. . . .

Based upon the lack of authority, the court concluded that "Healthmart had no notice that DAI was considering filing for arbitration until Mr. Lawrence checked his spam folder on February 26 and discovered Mr. Ford's emails, the day before DAI filed their demand for arbitration."  Regardless, as discussed *infra*, the trial court's decision that there was a lack of good faith on the part of DAI does not rest upon Mr. Lawrence's failure to respond to these emails; rather, it is based upon DAI's unilateral actions in seeking arbitration without complying with Mr. Lawrence's request for a telephone conversation, and also on DAI's unilateral decision to not only arbitrarily set a deadline, but also its decision to move that deadline up.

arbitration particulars. This email also went into Healthmart's spam folder. On February 26 when Mr. Lawrence checked Healthmart's spam folder, he discovered Mr. Ford's emails. Mr. Ford's February 26 email stated that DAI would file for arbitration if the dispute could not be resolved by the next day, February 27. The arbitrary acceleration of the arbitrarily set deadline to respond indicates a lack of good faith and can only be explained by DAI's effort to get the matter to the mediator of their choice in a place of their choice before Healthmart could have any meaningful communication with DAI on particulars.

As set out above, the email correspondence, account summary statements, and testimonies of Messrs. Staggers and Lawrence support the trial court's findings. From the totality of the circumstances, we conclude that the evidence does not preponderate against the trial court's finding that DAI failed to show good faith when: (1) DAI unilaterally chose the arbitration particulars and filed for arbitration without first giving Mr. Lawrence the courtesy of a returned phone call; (2) Mr. Cassin failed to speak with Mr. Lawrence concerning the matter, and further failed to inform his coworkers of previous conversations Mr. Cassin had with Mr. Lawrence regarding the disputed October 2008 invoice. Furthermore, the evidence does not preponderate against the trial court's finding that DAI's action, in arbitrarily and unilaterally setting a deadline of March 1, is not in keeping with notions of fair play. Finally, the evidence supports the lower court's finding that DAI failed to comply with its own stated deadline, and instead went ahead and filed the arbitration demand on February 27.

As noted above in the Restatement (Second) of Contracts section, what constitutes "good faith" varies according to the context in which it is used. However, all questions of good faith in the performance or enforcement of a contract emphasize "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." The evidence here indicates that Mr. Lawrence had an expectation that the dispute over his bill would be addressed by telephone conversation, or would be addressed internally by Mr. Cassin. As noted above, there is no dispute that DAI failed to call Mr. Lawrence to discuss the dispute before unilaterally seeking arbitration. The Restatement further notes that good faith "excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." Here, the trial court found that DAI acted in bad faith in an effort to enforce the contract without first trying to resolve the matter through conversation. The evidence set out above does not preponderate against the trial court's finding. From the foregoing evidence, the gravamen of DAI's actions raise questions and concerns about fairness and reasonableness. The evidence indicates that DAI failed to make any reasonable efforts to resolve the dispute

before unilaterally seeking to enforce the arbitration clause; this fact is rendered more unreasonable by Mr. Lawrence's repeated requests, which went largely ignored, to have a telephone conversation with DAI, or to have Mr. Cassin inform the other DAI employees that he and Mr. Lawrence had previously discussed the billing. Even if we allow, *arguendo*, that DAI was within its contractual right to seek arbitration unilaterally, it engaged in further unfair practices by arbitrarily setting a deadline for March 1, which was a very short window. The unfair practice was compounded when DAI moved that date up and filed for arbitration on February 27. From the totality of the circumstances, we conclude that the evidence does not preponderate against the trial court's conclusion that DAI's actions were unreasonable under the facts and circumstances presented in this case, and that these actions resulted in an unfair advantage for DAI in terms of enforcement of the arbitration clause.

Concerning DAI's second issue that, even in the absence of good faith, Healthmart is required to arbitrate, this issue was not specifically addressed by the trial court based upon its interpretation of the law of the case dictated by ***Healthmart I***. In ***Healthmart I***, we held that Healthmart's argument that it could not be bound by the contract due to fraud in the inducement "may be moot if the trial court determines that DAI did not exercise a good faith effort to come to a mutual agreement regarding arbitration service, location, and choice of law." ***Healthmart I***, 2011 WL 1314662, at \*5. Based on this language, the trial court apparently concluded that if DAI failed to act in good faith in initially seeking arbitration, then DAI waived its right to seek arbitration pursuant to the contract. We note, however, that the prior opinion states only that a finding that DAI breached the duty of good faith "may" result in Healthmart's other arguments being moot. Consequently, the language in ***Healthmart I*** did not necessarily preclude a determination that DAI is entitled to seek arbitration despite its failure to act in good faith. As previously discussed, the trial court did not specifically address this issue and, therefore, failed to make any findings of fact and conclusions of law as to whether DAI was entitled to seek arbitration despite its failure to exercise good faith as required. The trial court is required by Rule 52.01 of the Tennessee Rules of Civil Procedure to make findings of fact and conclusions of law in all bench trials. Accordingly, we remand to the trial court for consideration of whether DAI's breach of the duty of good faith operates as a waiver of its right to seek arbitration pursuant to the contract, with directions to make appropriate findings of fact and conclusions of law on this issue.

For the foregoing reasons, we affirm the order of the trial court and remand with instructions for all further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed against the Appellant, Directory Assistants, Inc., and its surety.

_____
J. STEVEN STAFFORD, JUDGE